JUAN E. BRUNET JUSTINIANO, demandante y apelante, *v.* HON. RAFAEL HERNÁNDEZ COLÓN, GOBERNADOR DE PUERTO RICO, y ALEJANDRO SALGADO RIVERA, en calidad de FISCAL INDEPENDIENTE, codemandados y apelados.

*Número:* CE-88-432          *Resuelto:* 10 de abril de 1992

*José Ramón Carrión Morales* y *Héctor Santiago Rivera*, abogados del demandante y recurrente; *José Hamid Rivera*, de *Saldaña, Rey y Alvarado*, abogados del Honorable Gobernador de Puerto Rico; *Efraín González Tejera, Fiscal Delegado, Maricarmen Ramos de Szendrey, Fiscal Delegada, Lillian Cruz Fortier, Fiscal Especial Independiente Auxiliar*, y *Ramón Crespo Nieves, Fiscal Delegado*, abogados del *Fiscal Especial Independiente*, abogado de los demandados apelados.

El Juez Asociado Señor Negrón García emitió la opinión del Tribunal.

Juan E. Brunet Justiniano fue nombrado Fiscal Especial General I. Como tal, participó en la investigación de los notorios sucesos del Cerro Maravilla de 25 de julio de 1978.(¹) En 1983, luego de que el Senado denunciara ciertas fallas en esa gestión, fue suspendido de su empleo mientras un investigador especial (Lcdo. Agustín Mangual Hernández) evaluaba el asunto.

El informe rendido por el licenciado Mangual Hernández al entonces Secretario de Justicia, Lcdo. Nelson Martínez Acosta, sirvió de base para la reposición de Brunet Justiniano el 1ro de abril de 1984.(²) Esto no impidió que el 10 de octubre de 1986 el Fiscal Especial Independiente

---

(¹) Para un cuadro completo de los incidentes y las controversias judiciales suscitadas hasta el presente por esos hechos, véanse: *In re Colton Fontán*, 128 D.P.R. 1 (1991); *Pueblo v. Pérez Casillas*, 126 D.P.R. 702 (1990); *In re Colton Fontán*, 119 D.P.R. 417 (1987); *Pueblo v. Pérez Casillas*, 117 D.P.R. 380 (1986); *Pueblo v. González Malavé*, 116 D.P.R. 578 (1985); *Romero Barceló v. Hernández Agosto*, 115 D.P.R. 368 (1984); *Peña Clos v. Cartagena Ortiz*, 114 D.P.R. 576 (1983); *Soto v. Srio. de Justicia*, 112 D.P.R. 477 (1982).

(²) En lo pertinente, dicho informe señaló: "Según la prueba documental y testifical mencionada anteriormente, concluimos que *a pesar de que el Lcdo. Juan E. Brunet incurrió en las fallas que le imputa el Senado en su Informe Sobre las Fallas del Departamento de Justicia en las Investigaciones Llevadas a Cabo Sobre el Incidente del Cerro Maravilla*, las mismas no constituyen suficiente prueba para una formulación de cargos por conducta impropia o reprensible o incompetencia o inhabilidad profesional en el desempeño de sus funciones." (Énfasis suplido.)

(F.E.I.),[3] Lcdo. Alejandro Salgado Rivera, le formulara una querella disciplinaria por su conducta *profesional* por los mismos hechos, luego que este Tribunal así lo ordenara mediante Resolución de 7 de octubre de 1986.

El 10 de diciembre de 1986 el F.E.I. también le notificó la formulación de cargos *administrativos* (sustancialmente iguales a los cargos por la conducta profesional) conducentes a su destitución. Fue apercibido de que se tendrían como probados los hechos admitidos por él en declaraciones juradas y del *derecho a una vista sobre los hechos controvertidos*.[4]

El 11 de mayo de 1987 Brunet Justiniano presentó su renuncia, efectiva el 15 de mayo de 1987. Trece (13) días después, el 28 de mayo de 1987, el Gobernador se negó a aceptarla. Como razón, adujo la presentación de cargos administrativos por su desempeño como Fiscal durante la investigación del caso del Cerro Maravilla.

Para dilucidar la querella disciplinaria, designamos Comisionado Especial al Juez Superior, Hon. Abner Limardo Sánchez. Después de la celebración de varias vistas, éste rindió el correspondiente informe. Acto seguido, el F.E.I. concedió quince (15) días al licenciado Brunet Justiniano para que mostrara causa por la cual no debía someter su

---

[3] El cargo de Fiscal Especial Independiente (F.E.I.) fue creado por la Ley Núm. 1 de 18 de enero de 1985, Leyes de Puerto Rico, pág. 3, para la investigación y el procesamiento de las personas que pudiesen haber cometido delitos en relación con los incidentes del Cerro Maravilla ocurridos el 25 de julio de 1978. A este funcionario, además, se le encomendó la facultad de llevar cualesquiera acciones civiles, administrativas o de ética profesional relacionadas con los incidentes.

[4] "Debemos advertirle que se tendrán por probados los hechos para los cuales esta Oficina tiene admisiones en declaraciones juradas ofrecidas por usted.

"Se le advierte, asimismo, que en relación con los hechos que sean contravertidos [sic] por usted, tiene derecho a una vista ante el Examinador que yo designe. A esos efectos se le concede el término de quince (15) días a partir del recibo por usted de estos cargos para que la solicite. De no hacerlo en ese término, entenderemos que no interesa vista alguna ante esta Oficina, sin que por ello renuncie a su derecho a apelar ante la Junta de Apelaciones del Sistema de Administración de Personal, en la eventualidad de que el Honorable Gobernador tomase acción en su contra.

"De no solicitar usted la vista oportunamente, haremos la recomendación que entendamos procedente al Honorable Gobernador." Apéndice 2, pág. 23.

recomendación al Gobernador *a base* de la determinación de hechos del Comisionado Especial, todo ello sin perjuicio de sus derechos en la eventualidad de que se tomara acción perjudicial en su contra. Brunet Justiniano, por su parte, entendió improcedente lo intimado por el F.E.I., toda vez que las conclusiones de hechos en el caso de conducta profesional no eran finales. Amparándose en la Regla 13(*l*) del Reglamento del Tribunal Supremo, 4 L.P.R.A. Ap. I-A, alegó que tenía un término de veinte (20) días, prorrogado hasta el 31 de agosto de 1987 por Resolución de 22 de julio de 1987, para presentar sus comentarios o enmiendas a dicho informe. Sostuvo, además, que cuando este Tribunal resolviera finalmente la controversia sobre su conducta profesional, estaría en mejor posición para evaluar la solicitud del F.E.I. En definitiva, postuló que debía esperarse que finalizara el proceso disciplinario para entonces continuar con el proceso administrativo.

El F.E.I. discrepó de ese enfoque. Por entender que los cargos administrativos imputados eran sustancialmente iguales a los presentados por conducta profesional, adoptó las conclusiones de hechos del Informe del Comisionado Especial, Hon. Abner Limardo Sánchez, y envió al Gobernador, a su vez, un informe con sus recomendaciones en cuanto a los cargos administrativos.

A modo de breve paréntesis, en *In re Colton Fontán*, 128 D.P.R. 1 (1991), evaluamos detalladamente y refrendamos casi en su totalidad el Informe del Comisionado Especial, con el beneficio de toda la transcripción de la prueba y la evidencia documental. Brunet Justiniano fue suspendido provisionalmente del ejercicio de la profesión por tres (3) años.

El 1ro de octubre de 1987, ocho (8) años después de su nombramiento, Brunet Justiniano presentó nuevamente su renuncia al cargo. No obstante, el Gobernador lo destituyó el 27 de octubre del mismo año. En su carta de destitución, el Primer Ejecutivo indicó que, aunque el F.E.I. te-

nía facultad para designar un oficial examinador que escuchara la prueba, éste había hecho suyas las conclusiones y determinaciones del Comisionado.

En desacuerdo con esto, el 20 de noviembre de 1987 Brunet Justiniano recurrió a la Junta de Apelaciones del Sistema de Administración de Personal (J.A.S.A.P.). Anteriormente, el 10 de noviembre de 1987, había instado en el Tribunal Superior, Sala de San Juan, una acción impugnadora de la actuación del Gobernador sobre sentencia declaratoria, entredicho provisional, *injunction* preliminar y permanente, y daños y perjuicios. En la alternativa, cuestionó la validez del procedimiento administrativo que culminó con su destitución. Adujo como fundamento la doctrina de cosa juzgada en el ámbito administrativo y violación del debido proceso de ley.

Los demandados —el Gobernador y el F.E.I.— presentaron oportunamente unas mociones de desestimación apoyadas en abundante prueba documental que el tribunal de instancia consideró como una solicitud de sentencia sumaria. Adujeron que el tribunal carecía de jurisdicción, pues Brunet Justiniano venía obligado a seguir el trámite dispuesto en el esquema legislativo de remedios administrativos y revisión judicial. En la alternativa, sostuvieron que: el Gobernador no venía obligado a aceptar las renuncias; no existía impedimento legal alguno para la formulación de cargos administrativos, y la destitución no infringió el debido proceso de ley.

El tribunal de instancia (Hon. Ángel F. Rossy García, Juez), aunque se declaró sin jurisdicción, acogió la tesis de los demandados, resolvió en sus méritos las controversias y mediante sentencia sumaria desestimó la demanda en todas sus partes.

Inconforme con este dictamen, Brunet Justiniano acudió ante nos. En síntesis, plantea y discute los siguientes extremos: (1) que erró el tribunal de instancia al concluir que no debía asumir jurisdicción porque no se había esta-

blecido un caso prima facie de violación de derechos civiles que constituyera una excepción a la doctrina de agotamiento de remedios administrativos; (2) que su renuncia —presentada dentro del término del nombramiento— cobró efectividad al transcurrir quince (15) días sin una acción responsiva del Gobernador; (3) que su segunda renuncia —presentada una vez concluido el término de su nombramiento y mientras ocupaba el puesto en virtud de una cláusula de continuidad (*holding over*)— no requería la aceptación del Gobernador, pues era efectiva a su presentación; (4) que la actuación del Gobernador creó una servidumbre involuntaria; (5) que las determinaciones de hechos preliminares en un procedimiento ético-disciplinario sub júdice en este Tribunal no son un sustituto adecuado de la vista administrativa requerida en el procedimiento de destitución de fiscales; y (6) que su destitución constituye un castigo cruel e inusitado.

I

■ Antes de examinar a fondo el aspecto jurisdiccional, es menester una breve observación. Es norma arraigada en nuestro ordenamiento que la jurisdicción es el "poder o autoridad de un tribunal para considerar y decidir casos o controversias". *Gearheart v. Haskell*, 87 D.P.R. 57, 61 (1963). Por esta razón, cuando un tribunal carece de jurisdicción, debe abstenerse de considerar los méritos de las controversias planteadas. En ese sentido la actuación del tribunal de instancia es incongruente con su propia determinación. Dicho foro enjuició las alegaciones de ambas partes y adjudicó la controversia como de ordinario hace un tribunal con jurisdicción.

■ Aclarado este extremo, evaluemos el aspecto jurisdiccional. De entrada, reiteramos que la doctrina de agotamiento de remedios administrativos es "una norma

de autolimitación judicial de carácter consuetudinario y esencialmente práctica ...". *Rivera v. E.L.A.*, 121 D.P.R. 582, 593 (1988). Su objetivo es determinar la etapa en que el litigante puede recurrir a los tribunales. *Delgado Rodríguez v. Nazario de Ferrer*, 121 D.P.R. 347 (1988); *García Cabán v. U.P.R.*, 120 D.P.R. 167 (1987); *E.L.A. v. 12,974.78 Metros Cuadrados*, 90 D.P.R. 506, 511 (1964). Su propósito es evitar una intervención innecesaria y a destiempo del Poder Judicial, que podría interferir con el cauce y desenlace normal del proceso administrativo.

■ Como excepción a dicha doctrina, hemos reconocido que un litigante no tiene que agotar los remedios administrativos cuando: (1) lo presentado es una cuestión de derecho que no requiere el ejercicio de discreción administrativa; (2) hay violación a los derechos civiles; (3) el remedio administrativo es inútil e inadecuado; (4) existe peligro de daño inminente, y (5) es clara la falta de jurisdicción. *Rivera v. E.L.A.*, 121 D.P.R. 582 (1988).

Sin embargo, a modo de excepción, en las circunstancias de este caso, Brunet Justiniano no tenía que agotar los remedios administrativos. Su reclamo ante el Poder Judicial contiene una cuestión de derecho que no requiere el ejercicio de discreción administrativa. Además, es evidente que su planteamiento tiene una dimensión constitucional ajena al campo especializado del organismo administrativo concernido. *Pierson Muller I v. Feijoó*, 106 D.P.R. 838 (1978). Brunet Justiniano invocó las disposiciones de la Ley Núm. 12 de 8 de agosto de 1974 (32 L.P.R.A. sec. 3524) —conocida como Ley de Derechos Civiles de Puerto Rico— y de la propia faz, sus alegaciones no eran inmeritorias. Todo lo contrario, presentó una genuina controversia de derecho que, además de ser novel, ameritaba la intervención de los tribunales. Esas alegaciones —rechazo del Primer Ejecutivo a su renuncia, mantenerlo en el cargo indefinidamente y violación al debido proceso de ley— prima

facie revestían un posible agravio de sus derechos constitucionales y estatutarios que por su patente intensidad ameritaban una urgente reparación. *Otero Martínez v. Gobernador*, 106 D.P.R. 552 (1977); *Pierson Muller I v. Feijoó*, supra; *Pedraza Rivera v. Collazo Collazo*, 108 D.P.R. 272 (1979); *García Cabán v. U.P.R.*, supra; *Delgado Rodríguez v. Nazario de Ferrer*, supra. El hecho de que, después de una exhaustiva investigación jurídica y de un detenido escrutinio, no tuviera razón, no desmerece esa primera apreciación.

No es persuasivo el argumento de los demandados apelados de que la impugnación de Brunet Justiniano, a la destitución o deseo de retener el empleo, es incompatible con sus alegaciones sobre la efectividad de su renuncia. Aparte de no ser enteramente incompatibles, nuestras normas procesales permiten alegaciones en la alternativa y las reclamaciones inconsistentes. Regla 6.5(b) de Procedimiento Civil, 32 L.P.R.A. Ap. III. Superado el obstáculo jurisdiccional, evaluemos los méritos de los otros planteamientos.

## II

Los fiscales son funcionarios públicos cuyos cargos tienen, como base estatutaria, la Ley Núm. 23 de 24 de julio de 1952 (3 L.P.R.A. secs. 90–93e, 95–96, 98 y 100). A su amparo son nombrados por el Gobernador con el consejo y consentimiento del Senado —Art. 3 (3 L.P.R.A. sec. 92)— "por el término de ocho (8) años y *hasta que sus sucesores tomen posesión de sus cargos*", Art. 4 (3 L.P.R.A. sec. 93). Al igual que los jueces de primera instancia, se observa que tales nombramientos contienen una "cláusula de continuidad", comúnmente conocida en la voz inglesa como *holding over*. Hasta la decisión mayoritaria emitida en *Nogueras v. Hernández Colón*, 127 D.P.R. 638 (1991) —en la cual el Tribunal, con *carácter prospectivo*, limitó el término de la

"cláusula de continuidad" a la finalización de la próxima sesión ordinaria de la Asamblea Legislativa siguiente a la expiración del nombramiento— la cláusula permitía al incumbente continuar indefinidamente en el puesto, cuyo período, de jure, se consideraba parte del término original —*Acosta v. Corte*, 63 D.P.R. 651, 657 (1944)— con el efecto de ampliar la continuación del cargo hasta que el sucesor tomara posesión.

■ Ello respondía al reconocimiento de que este tipo de cláusula tenía básicamente dos (2) propósitos: "(1) retener en todo momento en el cargo a una persona que ha sido nombrada con el consejo y consentimiento del Senado, incluyendo el período después de que su término ha expirado, hasta que el Senado pueda reunirse y concurrir con el Gobernador en volverlo a nombrar o elegir su sucesor; (2) evitar vacantes que la ley aborrece, toda vez que entorpecen la continuación de la administración de los asuntos públicos." *González v. Corte*, 62 D.P.R. 160, 165 (1943). Véanse, además: *Fernández v. Corte*, 71 D.P.R. 161, 178 (1950); *López v. Tribunal Superior*, 79 D.P.R. 20 (1956); *J.R.T. v. Milares Realty, Inc.*, 90 D.P.R. 844 (1964); *Betancourt v. Gobernador*, 119 D.P.R. 435 (1987); *Betancourt Morales v. Gobernador de P.R.*, 118 D.P.R. 149 (1986), voto concurrente y disidente; *Roberts v. State Ex Rel. Jackson Co. Bd. of Com'rs*, 278 N.E.2d 285 (1972).

■ Al igual que otros funcionarios públicos, los fiscales deben someter sus renuncias por escrito ante el Gobernador. Art. 207 del Código Político, 3 L.P.R.A. sec. 555. Si la renuncia es debidamente aceptada, el cargo queda vacante. Art. 208 del Código Político, 3 L.P.R.A. sec. 556; *El Pueblo ex rel Jusino v. Dávila*, 30 D.P.R. 873 (1922). La presentación de la renuncia no crea ipso facto una vacante, sino que es necesaria su aceptación para que otra persona pueda llenarla.

Lo expuesto nos lleva al segundo planteamiento, a sa-

ber, ¿tiene el Primer Ejecutivo, como autoridad nominadora, discreción para rechazar la renuncia de un Fiscal? Brunet Justiniano sostiene en la afirmativa, pero argumenta que el Gobernador pierde esa facultad al transcurrir quince (15) días sin que se pronuncie al respecto. Bajo este predicamento nos dice que su primera renuncia —11 de mayo de 1987— advino efectiva a los quince (15) días de sometida, y por ende, la carta del Gobernador de 28 de mayo de 1987 —negándose a aceptarla— carece de eficacia. Apoya su teoría en la doctrina de *Candelario Muñiz v. Tribunal Superior*, 101 D.P.R. 25 (1973).

No tiene razón. El término de quince (15) días, como bien argumentan los apelados, aplica únicamente a los *empleados* públicos. Los *funcionarios* públicos, como ya vimos, se rigen por otra disposición legal. Esta distinción quedó claramente establecida en *Candelario Muñiz v. Tribunal Superior*, supra, pág. 29:[5]

> Contrario al caso de los funcionarios públicos, las renuncias de los cuales tienen que ser aceptadas para que queden vacantes sus cargos (3 L.P.R.A. secs. 555 y 556), en el caso de los demás empleados del gobierno nada se dispone en la Ley de Personal sobre alguna acción a tomar con respecto a sus renuncias. Es en el Reglamento promulgado por la Junta de

---

[5] Véase *Negrón Soto v. Gobernador*, 110 D.P.R. 664 (1981).

"Es difícil establecer claramente la diferencia entre funcionarios y empleados. Es preciso que en cada caso particular se tomen en consideración las circunstancias envueltas en el mismo, la naturaleza de los deberes del cargo, los medios por los cuales esos deberes se ejecutan, la forma de su creación, su término y el fin perseguido. Principalmente se distinguen en que el del funcionario es un cargo de mayor importancia y con autoridad para dirigir o supervisar. Generalmente el cargo de un funcionario es creado por ley y goza de cierta permanencia, con deberes impuestos a su incumbente que envuelven algún ejercicio del poder soberano y en cuyo desempeño está envuelto el interés público. Véase *Pueblo v. Márquez*, 62 DPR 13, 16–18 (1943) (Del Toro), en que se resolvió que un subsecretario de un tribunal es un funcionario; *De La Vega v. Sancho Bonet, Tes.*, 56 DPR 753, 755 (1940) (Wolf), en que se resolvió que un secretario de una agencia administrativa (Junta Insular de Sanidad) designado sin término fijo, no es un funcionario; *Nazario v. Winship*, 56 DPR 837 (1940) (Hutchison), en que se resolvió que los taquígrafos de los tribunales no son funcionarios; y *Ugarte v. MacLeod*, 56 DPR 842, 847 (1940) (Hutchison), al mismo efecto." R.E. Bernier y J.A. Cuevas Segarra, *Aprobación e interpretación de las leyes en Puerto Rico*, 2da ed., San Juan, Pubs. J.T.S., 1987, Vol. I, pág. 104.

> Personal que se dispone que las renuncias deberán radicarse con no menos de 15 días de antelación al último día de trabajo. Nada se ha dispuesto al efecto de que dicha renuncia tenga que ser aceptada para ser efectiva, excepto que la renuncia puede ser aceptada 'en un plazo más breve de antelación' o sea, antes de los referidos 15 días. Tampoco se ha dispuesto, por supuesto, término alguno para tomar la acción positiva de aceptar la renuncia. (Énfasis suprimido.)

En su esfuerzo por prevalecer, Brunet Justiniano nos solicita que apliquemos por analogía el Art. 207(2) del Código Político, 3 L.P.R.A. sec. 555(2), dispositivo de que el cargo de un legislador renunciante queda vacante: "(1) cuando transcurran quince (15) días desde la presentación de la renuncia sin que ésta haya sido retirada, o (2) dentro de dichos quince (15) días, tan pronto el Presidente del cuerpo legislativo correspondiente reciba del organismo directivo central del partido con derecho a hacerla, la recomendación para el nombramiento del sustituto o de un sustituto interino."

La analogía es improcedente. El estudio de su historial legislativo revela que las disposiciones de la Ley sobre Renuncias y Vacantes de 25 de enero de 1901, Leyes de Puerto Rico, págs. 10–12 —similares a las que sobre este mismo particular adoptó el Código Político de 1902— no disponían término para que un puesto quedara vacante una vez presentada la renuncia. Fue mediante la Ley Núm. 73 de 20 de junio de 1956 (3 L.P.R.A. sec. 555) que, entre otras enmiendas para actualizar el estatuto, se incorporó el término de quince (15) días para las renuncias de los legisladores.

La Asamblea Legislativa tuvo la oportunidad de adoptar un término uniforme para todas las situaciones reglamentadas por el estatuto. No lo hizo. Ausente otro propósito, hemos de presumir que quiso darle un trato diferente a los legisladores renunciantes. Existe, además, otro importante fundamento que abona a esta determinación. Los continuos desarrollos doctrinales referentes al debido pro-

ceso de ley han promovido una mayor cautela y rigor en la destitución de empleados y funcionarios públicos. Es evidente que en muchos casos, el término de quince (15) días podría resultar irrazonable para cumplir con los requisitos mínimos constitucionales previos a las destituciones. Aprisionar el poder nominador a ese término cuando se presenta una renuncia —conocido por el renunciante de una posible destitución— tiende a afectar el interés público.

En resumen, como regla general la renuncia de un funcionario público notificado de una posible destitución sólo será efectiva y creará una vacante si es debidamente aceptada o si transcurre un tiempo razonable sin que inexplicablemente la autoridad nominadora actúe afirmativamente. En ausencia de un término estatutario para determinar la razonabilidad del plazo, deberán considerarse criterios tales como: (1) la naturaleza del cargo que ocupa el renunciante; (2) la necesidad de realizar una investigación antes de tomar una decisión; (3) los objetivos específicos que persigue la investigación, y (4) la complejidad del proceso.

## III

Respecto a su segunda renuncia de 1ro de octubre de 1987, Brunet Justiniano elabora la tesis de que ésta cobró efectividad *de inmediato*, pues ya había concluido el término de ocho (8) años de su nombramiento. En la alternativa reproduce el argumento de que fue efectiva al pasar quince (15) días sin que el Gobernador actuara. Bajo cualesquiera de esas opciones, sostiene que el Gobernador carecía de jurisdicción para destituirlo.

En *Candelario Muñiz v. Tribunal Superior*, supra, pág. 29, dijimos que "[n]o es lógico suponer que una persona que renuncia un puesto bajo la Ley de Personal venga obligada indefinidamente a continuar ejerciéndolo hasta que se le

acepte la renuncia. De ser así la norma de derecho, la persona renunciante en efecto quedaría obligada a continuar ejerciendo el cargo en contra de su voluntad, pues de no hacerlo corre el riesgo de ser destitu[i]da por haberlo abandonado ...". Añadimos que "[e]sto no quiere decir ... que mediante tal renuncia un empleado pueda evadir una investigación dirigida a la formulación de cargos que, de ser probados, resultarían en su destitución". Íd., pág. 30.

En situaciones normales, un funcionario público tiene derecho a renunciar a su cargo presentándole su renuncia al Gobernador, y ese derecho del funcionario crea el deber recíproco del Gobernador de aceptarle su renuncia sin condición alguna. *Ibáñez v. Swope, Gobernador*, 58 D.P.R. 20 (1941). Esta regla general tiene excepciones. Concluimos que sería un contrasentido su aplicabilidad si el funcionario renunciante es objeto de una investigación relacionada con el desempeño en su puesto o utiliza la renuncia como mecanismo para evadirla o burlar la justicia.

A igual solución, y por los mismos razonamientos, se llegó en *In re Peoples*, 250 S.E.2d 890, *cert.* denegado 442 U.S. 929 (1978). Allí se trataba de un juez que sometió su renuncia al Gobernador cuarentiún (41) días después de que se le informara que estaba bajo investigación por posible conducta impropia en el manejo de las causas criminales. El Gobernador, quien desconocía que el renunciante era investigado; aceptó la renuncia. Diez (10) días después, le notificaron los cargos administrativos. El juez cuestionó la jurisdicción del foro administrativo para ventilar los cargos y alegó que sólo a jueces en funciones podía procesárseles.

El Tribunal Supremo de Carolina del Norte confirmó el dictamen de la comisión que resolvió que la renuncia, aunque aceptada, no tornaba académico el procedimiento. Una vez la comisión adquirió jurisdicción sobre el querellado, mediante la notificación de que era investigado, el foro ad-

ministrativo retenía su jurisdicción hasta la culminación del procedimiento.

En el caso ante nos la situación es más adversa. El procedimiento administrativo contra Brunet Justiniano comenzó *antes* de su primera carta de renuncia. Los cargos administrativos le fueron notificados el 10 de diciembre de 1986 y su primera renuncia fue fechada el 11 de mayo de 1987. Cuando sometió la segunda el 1ro de octubre de 1987, todavía se efectuaba el procedimiento administrativo. De manera, pues, que esas renuncias, aún si automáticamente hubiesen cobrado efectividad, no podían despojar al F.E.I. de su jurisdicción para culminar el procedimiento iniciado con anterioridad.

## IV

La cronología reseñada y la no aceptación de ambas renuncias por parte del Gobernador, ¿infringió los preceptos constitucionales que prohíben la servidumbre involuntaria? Brunet Justiniano argumenta en la afirmativa. Cuestiona el requisito legal de que una renuncia, para que sea efectiva, debe ser aceptada. Aduce que ello obliga al funcionario público a permanecer en el cargo en contra de su voluntad. A juicio suyo, esa restricción de la libertad crea una servidumbre involuntaria sin el debido proceso de ley.

Tampoco tiene razón. El espíritu que animó la aprobación de la Decimotercera Enmienda de la Constitución federal[6] y la Sec. 12 del Art. II de nuestra Constitución,[7]

---

[6] "Artículo [XIII]

"Sección 1. Ni la esclavitud ni la servidumbre involuntaria existirán en los Estados Unidos o en cualquier lugar sujeto a su jurisdicción, salvo como castigo por un delito del cual la persona haya sido debidamente convicta.

"Sección 2. El Congreso tendrá facultad para hacer cumplir las disposiciones de esta enmienda mediante legislación adecuada." Const. EE. UU., L.P.R.A., Tomo 1, ed. 1982, págs. 195–196.

[7] El Art. II, Sec. 12 de la Constitución del Estado Libre Asociado de Puerto Rico, L.P.R.A., Tomo 1, ed. 1982, pág. 323, dispone:

así como sus desarrollos e interpretaciones judiciales, reflejan que ese no fue el alcance.

La Decimotercera Enmienda se adoptó en 1865. Representó no sólo el mecanismo directo para abolir de jure la esclavitud negra, sino otras formas de servidumbre como la esclavitud económica de los peones (*peonage*) propia de los territorios que formaron parte de las excolonias españolas y el llamado *chinese coolie trade. Robertson v. Baldwin*, 165 U.S. 275 (1897); *Hodges v. United States*, 203 U.S. 1 (1906); *Slaughter-House Cases*, 16 Wall. (83 U.S.) 36 (1872); G. Sidney Buchanan, *The Quest for Freedom: A Legal History of the Thirteenth Amendment*, 12 (Núms. 1–5) Hous. L. Rev. 1–34, 331–378, 592–639, 843–889 y 1069–1085 (1974–1975); 13 Hous. L. Rev. 63–83 (1975); J. Ten-Broek, *Thirteenth Amendment to the Constitution of the United States*, 39 Cal. L. Rev. 171 (1951). Posteriormente su desarrollo cubrió una gran variedad de circunstancias y condiciones con el propósito primordial de mantener un sistema de trabajo completamente libre y voluntario. Se hizo extensiva para desaprobar condiciones restrictivas, tales como a las que están sometidos los obreros migrantes y los sirvientes domésticos. Véase *United States v. Booker*, 655 F.2d 562, 566 (4to Cir. 1981).

El término "servidumbre involuntaria" tiene un significado más amplio que "esclavitud". Su esencia la constituye el uso indebido de la ley o la fuerza para obligar a un individuo a trabajar en contra de su voluntad para beneficio de otro. *United States v. Mussry*, 726 F.2d 1448 (9no Cir. 1984); *United States v. Schackney*, 333 F.2d 475 (2do Cir. 1964); *Bailey v. Alabama*, 219 U.S. 219 (1911). La

---

"No existirá la esclavitud, ni forma alguna de servidumbre involuntaria salvo la que pueda imponerse por causa de delito, previa sentencia condenatoria. No se impondrán castigos crueles e inusitados. La suspensión de los derechos civiles incluyendo el derecho al sufragio cesará al cumplirse la pena impuesta.

"No se aprobarán leyes *ex post facto* ni proyectos para condenar sin celebración de juicio."

prohibición va dirigida a la involuntariedad del trabajo, independientemente de que éste sea bien o mal compensado. *Heflin v. Sanford*, 142 F.2d 798 (5to Cir. 1944).

Recientemente, en *United States v. Kozminski*, 487 U.S. 931 (1988), el Tribunal Supremo federal, al evaluar la legislación aprobada por el Congreso para hacer cumplir la Decimotercera Enmienda, sostuvo que la expresión "servidumbre involuntaria" significaba aquella condición en que la víctima es forzada a trabajar para el acusado mediante el uso o amenaza de aprisionamiento, castigo físico o coerción legal.

Por otra parte, la Sec. 12 del Art. II de nuestra Constitución, *supra*, tampoco tiene el alcance pretendido. Aunque los debates constitucionales arrojan poca luz, sí nos permiten corroborar que no se vislumbraron situaciones como la que hoy confrontamos. "La proscripción de la esclavitud y la servidumbre involuntaria se copiaba textualmente de los párrafos 15 y 16 del artículo 2 de la Ley Orgánica, que a su vez derivaban de la Enmienda Decimotercera a la Constitución de los Estados Unidos. La prohibición de castigos crueles e inusitados provenía de la Enmienda Octava y del párrafo 12 del artículo 2 de la Ley Jones." J. Trías Monge, *Historia Constitucional de Puerto Rico*, Río Piedras, Ed. U.P.R., 1982, pág. 197. Sobre este particular, vale la pena resaltar las expresiones del delegado Jaime Benítez ante la petición del delegado José Veray, Jr. para que se suprimiera la palabra "servidumbre". Señaló:

Debo decir que el término "servidumbre", que es el término clásico dentro de la Constitución de los Estados Unidos (*neither slavery nor involuntary service*), está ya cubierto en la prohibición que se hace al trabajo involuntario y, además, las restantes protecciones del trabajo que aparecen en una sección posterior. La razón para retener el concepto de la esclavitud es, no solamente por su valor histórico, por su natural correspondencia en una carta de derechos, sino porque no se refiere única y exclusivamente, tampoco esto a la situación histórica de esclavitud

sino que abarca cualquier otro sometimiento de unas personas a la voluntad y al poder de otros, sin recursos. 3 Diario de Sesiones de la Convención Constituyente 1603 (1952).

En consecuencia, no tiene razón Brunet Justiniano en su argumentación.

## V

El fiscal o acusador público cumple o forma parte de la abogacía del Estado. Véase H. Frugone Schiavonne, *La abogacía del Estado, el Ministerio Público y Fiscal y la Procuraduría del Estado en lo contencioso administrativo*, Montevideo, Fundación de Cultura Universitaria, 1981. Como funcionario público no está exento de *responsabilidad civil, responsabilidad penal*[8] y *responsabilidad administrativa*. "Los funcionarios públicos ... además de por la relación de sujeción general, están unidos a la administración por la relación de sujeción especial. La violación de alguna de las normas que disciplinan esta última por parte del funcionario acarrea su responsabilidad administrativa, traducida en sanciones disciplinarias." L. M. Cazorla Prieto, *Temas de Derecho Administrativo*, 2da ed., Madrid, Escuela de Inspección Financiera y Tributaria, 1979, pág. 508. "[L]a sanción es consecuencia de una infracción administrativa, también la potestad sancionadora de la administración es no causa, sino efecto y consecuencia de otras potestades y sobre todo, y de manera muy especial, colofón de la existencia de un ordenamiento jurídico administrativo, que demanda la necesidad de reprimir las infracciones al mismo, al objeto de defender en todo momento su validez y eficacia. Desde el instante mismo en

---

[8] Además de la responsabilidad criminal general que les afecta como a cualquier ciudadano, pueden incurrir en responsabilidad especial cuando cometen alguno de los delitos tipificados en el Código Penal para los funcionarios públicos en el ejercicio de sus cargos.

que admitimos la existencia de un ordenamiento jurídico administrativo hay que concluir admitiendo también la existencia de una potestad sancionadora o punitiva de la Administración que determina el que en numerosos casos pueda infligir sanciones a los sujetos, sean externos a la misma, esto es a cualquier ciudadano que haya violado un deber frente a la Administración, o bien sean sujetos ligados a la Administración por medio de una particular relación, como el funcionario público, y en general cualquiera que sea admitido a un oficio público o en un Instituto o al goce de un servicio público. La Administración, por consiguiente, aplica la sanción relativa a los actos de ella emanados, cuando hayan sido realizados violando cualquiera de las normas que la garantizan." (Escolio omitido.) M. Montoro Puerto, *La infracción administrativa: características, manifestaciones y sanción*, Barcelona, Ed. Nauta, 1965, pág. 329.

■ Por último, los fiscales, por su condición de abogados, también están sujetos a las *acciones disciplinarias por infracción al Código de Ética. In re Colton Fontán,* supra; *In re Rivera Cruz,* 126 D.P.R. 768 (1990); *In re Calderón Marrero,* 122 D.P.R. 557 (1988); *In re Secretario de Justicia,* 118 D.P.R. 827 (1987).

La naturaleza independiente de cada una de las cuatro (4) acciones también puede significar rumbos procesales diferentes. Así, el trámite disciplinario por infracciones al Código de Ética —que encuentra su apoyo legal en la Regla 13 del Reglamento del Tribunal Supremo de 1975 (4 L.P.R.A. Ap. I-A)— estipula que una vez presentada una querella contra abogados y jueces del Tribunal de Primera Instancia, se celebrará una vista evidenciaria ante este Tribunal o ante un Comisionado Especial. La parte querellada tiene derecho a confrontarse con los testigos en su contra, contrainterrogarlos, examinar la prueba documental o material que se presente en su contra y presentar

testigos y evidencia a su favor. Finalmente se rinde un informe con las determinaciones de hechos. Las partes tienen un término simultáneo de veinte (20) días, contados desde la notificación del informe, para comentarlo u objetarlo y recomendar las acciones que deban tomarse. Transcurrido dicho término o aquel otro que este Tribunal dispusiere, queda el caso sometido para resolver conforme a derecho.

Por otra parte, *la acción administrativa* que permite la suspensión o destitución de fiscales tiene su base legal en el Art. 5(a), 3 L.P.R.A. sec. 93(a):

> Los Fiscales de Puerto Rico podrán ser suspendidos de empleo y sueldo o destituidos de sus cargos antes del vencimiento del término para el cual fueron nombrados, por los siguientes motivos:
> (1) Conducta inmoral, impropia o reprensible;
> (2) incompetencia o inhabilidad profesional manifiesta en el desempeño de sus funciones y deberes;
> (3) la convicción por cualquier delito grave o delito menos grave que implique depravación moral;
> (4) insubordinación o abandono de sus deberes.

El Art. 6(b), 3 L.P.R.A. sec. 93(b), dispone detalladamente el procedimiento a seguir:

> La querella contra cualquier fiscal se podrá radicar bajo juramento por cualquier ciudadano o a instancia del Secretario de Justicia, ante el Departamento de Justicia. Una vez radicada la misma el Secretario ordenará una investigación de los hechos imputados. En base al resultado de dicha investigación el Secretario podrá desestimar la querella presentada o proceder a la formulación y notificación de cargos por escrito contra el fiscal querellado, expresándole las causas y fundamentos para ello y *dándole oportunidad de ser oído.*
> El Secretario de Justicia una vez probados los cargos, someterá un informe al Gobernador de Puerto Rico, conteniendo las determinaciones, conclusiones y recomendaciones que surjan de dicho procedimiento. En base a dicho informe el Gobernador determinará la acción que proceda.
> La separación permanente del cargo de un fiscal no afectará los derechos adquiridos del fiscal o aquellos derechos adquiri-

dos bajo la Ley de Retiro del Personal del Gobierno del Estado Libre Asociado, secs. 761 a 788 de este título. (Énfasis suplido.)

█ Para que la destitución de un funcionario público cumpla con el debido proceso de ley, también debe satisfacer nuestros pronunciamientos en *Torres Solano v. P.R.T.C.*, 127 D.P.R. 499 (1990); *Vélez Ramírez v. Romero Barceló*, 112 D.P.R. 716 (1982), y las garantías mínimas establecidas en *Cleveland Board of Education v. Loudermill*, 470 U.S. 532 (1985), y su progenie.

En síntesis, *Cleveland Board of Education v. Loudermill*, supra, exige que antes del despido la autoridad nominadora debe notificar al empleado los cargos en su contra y la intención de despedirlo, y concederle la oportunidad de una vista informal para que presente su versión de los hechos. No tiene que ser una vista formal y elaborada. Tampoco tiene que resolver definitivamente su propiedad, sino más bien servir como un cotejo inicial para evitar que se tomen decisiones erróneas o para determinar si existe base razonable sobre la veracidad de los cargos que sostengan el despido. Después de esa vista informal, podrá decretarse el despido, sujeto a la celebración posterior de una vista formal que cumpla todos los requisitos del debido proceso de ley.

Aclarados estos extremos, ¿se ajustó la destitución del Fiscal Brunet Justiniano al principio constitucional del debido proceso de ley? Contestamos esta interrogante en la afirmativa e inmediatamente exponemos los fundamentos. *Primero*, se cumplió el requisito escrito de la presentación de una querella bajo juramento ante el Departamento de Justicia. *Segundo*, el Secretario de Justicia ordenó la investigación de los hechos. En este trámite el F.E.I. adoptó las determinaciones de hechos que el 21 de mayo de 1987 hiciera el Comisionado Especial, Hon. Abner Limardo Sánchez, nombrado por este Tribunal en la acción ético-disciplinaria. Ese informe fue precedido de un sinnúmero

de salvaguardas procesales tales como notificación oportuna, vistas evidenciarias, representación de abogados, tiempo suficiente para su preparación y defensa, descubrimiento de prueba y otros. *In re Colton Fontán*, supra.

Contrario a su objeción, no creemos que esta conducta del F.E.I. afectara sus derechos. Difícilmente puede concebirse una manera más justa e imparcial para dilucidar los hechos. Si bien es cierto que el F.E.I. no le encomendó esta tarea a un oficial examinador por él seleccionado, la vista plenaria ante un Comisionado Especial, precisamente designado por este Tribunal, disipó cualesquiera dudas respecto a la imparcialidad del juzgador. *Tercero*, la adopción de las determinaciones de hechos no se hizo ciega y caprichosamente; tampoco de manera final. Todo lo contrario, al Fiscal Brunet Justiniano se le ofreció la oportunidad de controvertirlos, lo cual realizó. Debe recordarse que algunos de los hechos ya los había admitido en declaraciones juradas. El que la determinación de hechos del Comisionado Especial estuviera sujeta a una posible modificación o revocación, no afecta los derechos del apelante. De ninguna manera se requiere que en la etapa predespido los hechos se hayan probado con carácter final y firme. Sería un absurdo y tornaría ese trámite en uno definitivo. Todo lo contrario, sólo es necesario que estén apoyados en prueba. Sólo serán finales y firmes cuando la persona afectada haya utilizado los trámites apelativos en los organismos administrativos o tribunales correspondientes, o haya transcurrido el término pautado sin ejercitar sus derechos. Como bien apuntan los apelados, tan sujeta a modificación o revocación estarían las determinaciones de un oficial examinador —si se hubiese nombrado— como lo están las que se adoptaron del Comisionado Especial. *Cuarto*, se formularon y notificaron por escrito los cargos. *Quinto*, al formulársele los cargos se le brindó la oportunidad de una vista administrativa *antes del despido*, la cual objetó. De esta

manera se le garantizó la "oportunidad de ser oído". *Torres Solano v. P.R.T.C.*, supra.

Resolvemos que el procedimiento seguido por el F.E.I. está en consonancia con el requisito de una vista informal exigido por *Torres Solano v. P.R.T.C.*, supra. En esa ocasión Brunet Justiniano hubiese tenido la oportunidad de exponer una vez más su versión de los hechos. *Sexto*, al no ser controvertidos los hechos, el Secretario de Justicia los dio por probados y sometió un informe al Gobernador con determinadas recomendaciones. Ello dio pie a que el Gobernador determinara procedente la destitución. Y *séptimo*, la vista formal del trámite apelativo ante la Junta de Apelaciones del Sistema de Administración de Personal, que Brunet Justiniano gestionó oportunamente, representó una oportunidad adicional para probar su versión de los hechos e improcedencia del despido.

## VI

Réstanos evaluar la alegación de castigo cruel e inusitado. En el pasado hemos señalado que "[e]sa prohibición constitucional tiene como origen el deseo de proscribir castigos bárbaros e inhumanos, como los de quema en la hoguera, la decapitación, el desmembramiento del cuerpo humano y algunas formas de tortura que antiguamente eran mas o menos comunes". *Pueblo v. Jaimán Torres*, 86 D.P.R. 700, 701–702 (1962). Véanse: *Pueblo v. Pérez Méndez*, 83 D.P.R. 228, 233 (1961); *Wilkerson v. Utah*, 99 U.S. 130 (1878); *Black v. United States*, 269 F.2d 38 (9no Cir. 1959); *Hemans v. United States*, 163 F.2d 228 (6to Cir. 1947).

Sin embargo, nuestra jurisprudencia ha reconocido su aplicación en otras situaciones, tales como la prisión indefinida por desacato civil cuando como medida reponedora deja de surtir efecto, *Espinosa v. Ramírez, Alcaide de Cárcel*, 72 D.P.R. 901 (1951); cuando la pena se convierte en un

castigo perpetuo, *García v. Luciano*, 115 D.P.R. 628 (1984); *Mari Bras v. Alcaide*, 100 D.P.R. 506 (1972); las penas desproporcionadas y arbitrarias, *Pueblo v. Pérez Zayas*, 116 D.P.R. 197 (1985); la disparidad en cuanto a la aplicación de penas distintas a personas en igualdad de condiciones, *Amy v. Adm. Deporte Hípico*, 116 D.P.R. 414 (1985), y la imposición de pena de reclusión por el solo hecho de ser adicto a drogas, *Martínez Rodríguez v. Jefe Penitenciaría*, 92 D.P.R. 629 (1965); *Robinson v. California*, 370 U.S. 660 (1962). Véanse: D. Nevares-Muñiz, *Derecho Penal Puertorriqueño: Parte General*, Hato Rey, Ed. Inst. Desarrollo del Derecho, 1983, págs. 311–324; D. Nevares-Muñiz, *The Eighth Amendment Revisited: A Model of Weighted Punishments*, 75 J. Crim. L. & Criminology 272 (1984).

No concebimos que la negativa del Primer Ejecutivo a aceptar su renuncia, la formulación de cargos y la consiguiente destitución de Brunet Justiniano encuadren en las prácticas que la Constitución deseó proscribir. Reconocemos que ese proceso le haya generado angustia y desasosiego, y afectado su tranquilidad. Esta realidad es resultado inevitable de nuestro sistema de justicia.

Finalmente, no nos persuade la tesis de Brunet Justiniano de que el proceso le priva el interés propietario sobre su reputación y, además, le limita sus oportunidades de empleo como abogado, tanto en el servicio público como en la práctica privada. Ausente una violación del debido proceso de ley, ello también es consecuencia lógica de la conducta y de los actos ilegales y antiéticos de cualquier persona, bien sea abogado, funcionario público o ciudadano particular. *In re Colton Fontán*, supra.

Por los fundamentos expuestos, *se dictará sentencia confirmatoria*.

El Juez Asociado Señor Rebollo López concurre con el resultado sin opinión escrita. La Juez Asociada Señora Naveira de Rodón se inhibió.