EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Ligia M. Ortiz Rivera, Héctor R. Ortiz Rivera<br>      Recurridos<br><br>                v.<br><br>Panel sobre el Fiscal Especial Independiente, Lic. Manuel Reyes Serrano, Lic. Enrique Rivera Santana, Lic. José Orlando Grau<br>    Recurrentes | Certiorari<br><br>2001 TSPR 134<br><br>155 DPR ____ |

Número del Caso: CC-1998-249


Fecha: 8/octubre/2001


Tribunal de Circuito de Apelaciones:
                        Circuito Regional I


Panel integrado por su Presidente, Juez Sánchez Martínez y los Jueces Broco Oliveras y Urgell Cuebas


Abogados de la Parte Peticionaria:
                        Lcdo. Gilberto Vilá Navarrete
                        Lcdo. Guillermo Garau Díaz


Abogados de la Parte Recurrida:
                        Lcdo. José Juan Nazario de la Rosa
                        Lcdo. Juan Santiago Nieves


Abogado del Interventor Fernando Campoamor Redín:
                        Lcdo. Fernando Olivero Barreto


Materia: Revisión Administrativa



    Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

gia M. Ortiz Rivera,
Héctor R. Ortiz Rivera

      Recurridos

                v.

                          CC-1998-249

nel sobre el Fiscal
Especial Independiente,
c. Manuel Reyes Serrano,
c. Enrique Rivera Santana,
     Lic. José Orlando Grau

      Recurrentes

Opinión del Tribunal emitida por el Juez Asociado señor Corrada del Río

San Juan, Puerto Rico, a 8 de octubre de 2001.

Nuevamente nos enfrentamos a una controversia acerca del derecho que tienen los ciudadanos a obtener información en manos del gobierno, ésta vez en su dimensión procesal. En específico, el presente caso nos provee la oportunidad de expresar y aclarar cuál es el foro que posee jurisdicción primaria para adjudicar controversias relativas a dicho derecho: el foro administrativo o el judicial. Veamos.

I

El 9 de diciembre de 1992 la Sra. Ligia M. Ortiz Rivera y el Sr. Héctor R. Ortiz Rivera (en adelante, recurridos) iniciaron un trámite ante el    Secretario    de    Justicia    para    que    se    nombrara    un

Fiscal Especial Independiente (FEI), al amparo de la Ley Núm. 2 de 23 de febrero de 1988, 3 L.P.R.A. ss. 99h *et seq* (en adelante, Ley Núm. 2). En su escrito, titulado "Querella Jurada y Solicitud de la Designación de un Fiscal Especial Independiente", los recurridos hicieron una serie de imputaciones de conducta grave contra un ex Juez, el Hon. Fernando Campoamor Redín (o "el querellado").[1] Asimismo, se alegó específicamente que el querellado había "utilizado y obtenido ventaja de su posición como Juez Superior", utilizando "su autoridad, influencia y reconocimiento como tal" al llevar a cabo ciertos actos ilegales. Por último, se alegó que luego de que los recurridos presentaran una demanda civil en contra del querellado por los hechos imputados en la querella, éste intervino ilegalmente en los procedimientos judiciales

---

[1] En síntesis, la querella le imputaba al ex juez Campoamor, *inter alia*, haber movido ilegalmente las verjas que marcaban la colindancia entre una finca propiedad suya y una finca propiedad de la Sucesión Ortiz-Rivera (de la cual los recurridos forman parte); haberse apropiado de 2,000 metros cuadrados de la finca perteneciente a dicha Sucesión; apropiarse ilegalmente de un tanque perteneciente a la Sucesión, y utilizar el agua para su propio negocio; haberse apropiado ilegalmente de más de 13,000 yardas cúbicas de material de relleno, tomadas de una ladera de una montaña en la finca perteneciente a la Sucesión, alegadamente valoradas en $70,000; haberse apropiado ilegalmente y para beneficio propio de unos 1,500 metros cuadrados de grama, alegadamente removidos de la finca propiedad de la Sucesión; haber utilizado ilegítimamente la finca de la Sucesión para cavar tres (3) grandes trincheras de unos 6,000 pies cúbicos cada una para enterrar pollos muertos de su negocio, a pesar de que en una ocasión previa cuando hizo otra trinchera, un miembro de la Sucesión se quejó de ello, y el ex Juez se comprometió a no repetir tal actuación. Apéndice, pp. 61-62.

"alterando la minuta del 24 de septiembre de 1992".

El 31 de diciembre de 1992 el Secretario de Justicia Interino le informó a los recurridos mediante carta que se había efectuado una "investigación preliminar de rigor" conforme a lo dispuesto en la Ley Núm. 2. En la carta se indicó que, a la luz de los resultados de la investigación preliminar, solicitaría al Panel sobre Fiscal Especial Independiente (en adelante, "el PFEI" o "el Panel") el nombramiento de un FEI para efectuar una investigación en su fondo indicando **"que la prueba recopilada constituye causa suficiente para creer que el Juez Fernando Campoamor Redín ha incurrido en la comisión de delitos contemplados en [la] ley"**. (Énfasis suplido.) Consecuentemente, el Panel nombró al Lic. Federico Torres Jiménez como FEI del caso.

No obstante, al cabo de un año, el 3 de diciembre de 1993, el FEI designado rindió su informe al Panel en el cual concluyó que no procedía instar acción penal alguna contra el querellado.[2]

El 9 de diciembre de 1993, el Presidente del Panel remitió a los recurridos copia del informe final del FEI. El 15 de diciembre de 1993, los abogados de los recurridos cursaron al Panel una carta mediante la cual solicitaban reconsideración de la determinación del FEI. Solicitaron, además, que el Panel les indicara cual era "el procedimiento a seguir para canalizar su solicitud de reconsideración".[3] Por último, solicitaron que se les permitiera "examinar la totalidad del expediente del fiscal, así como toda la información obtenida durante el curso de [la] investigación".[4]

El 24 de diciembre de 1993 la Directora Ejecutiva del Panel le informó a los recurridos mediante carta que, debido a que un miembro del Panel se encontraba enfermo, su petición de 15 de diciembre de 1993 sería discutida en una reunión posterior del Panel.[5] Varias semanas transcurrieron hasta que, finalmente, el 3 de febrero de 1994, el Panel le envió una comunicación escrita a los recurridos, informándole que se denegaba su solicitud de 15 de

---

[2] En su informe, el FEI dio múltiples razones para justificar su conclusión, tales como la prescripción de los delitos, falta de prueba suficiente, ausencia de "intención criminal", y ausencia de todos los elementos del tipo delictivo, entre otras. Apéndice, pp. 63-66. En cuanto a la imputación de que el querellado había alterado la minuta en un caso civil en el cual él era parte demandada, el informe del FEI concluye que "aunque es incontestable la intervención indebida del Juez Campoamor respecto al documento", no se infringió disposición penal alguna pues el documento alterado no era la minuta final, sino solamente un borrador de minuta. En todo caso, concluye el informe, hubo una "posible violación a la ética judicial". Apéndice, pág. 66.

[3] Apéndice, pág. 67.

[4] *Id.* Cabe señalar que, posteriormente, el 29 de diciembre de 1993, los recurridos presentaron otro escrito de reconsideración más extenso y detallado. *Id.*

[5] *Id.*

diciembre "porque la reconsideración de la decisión del Fiscal Especial Independiente limitaría y vulneraría la independencia de dicho funcionario".[6]

Conforme a la Ley de Judicatura vigente en aquel momento, el 7 de marzo de 1994, los recurridos acudieron al Tribunal Superior mediante un recurso de revisión.[7] El recurso tenía el propósito de que se revisara la actuación del Panel, primero, por éste no haber ordenado la "reinvestigación" de la querella "de forma adecuada"; y segundo, por no haber "relevado" al FEI que rindió el informe y nombrado a otro con el propósito de que "hiciera una [segunda] investigación adecuada y determinara luego de la misma si se debía o no presentar denuncias contra el Juez Campoamor". Apéndice, pág. 68.[8]

En su sentencia de 8 de agosto de 1994, el Tribunal de Superior[9] llegó a las siguientes conclusiones de hecho, que estimamos pertinentes al caso de autos:

> Una lectura del informe que rindió el FEI al Panel . . . revela que la labor investigativa del FEI en este caso fue **seriamente defectuosa,** y que el razonamiento en que descansó el FEI para justificar su decisión de no presentar denuncias criminales contra el juez querellado contiene **graves errores de derecho.**

---

[6] *Id.*

---

[7] Sabido es que previo a la Reforme Judicial de 1994, el foro con jurisdicción para revisar las actuaciones de las agencias administrativas era el Tribunal Superior.

[8] Resulta sumamente importante y pertinente aclarar cuál es el alcance de la revisión que pretendían los recurridos. A tales efectos, citamos la Sentencia del Tribunal de Primera Instancia de 8 de agosto de 1994 (Apéndice, pp. 67-68):

> Aunque los [recurridos] argumentan enfáticamente ante el Tribunal que el informe del FEI Torres Jiménez está plagado de errores de derecho, ellos hicieron claro durante la vista que se celebró el 11 de marzo [de] 1994 que **no pretenden en forma alguna que el Tribunal revise directamente las actuaciones del FEI, y menos que le ordene al FEI el presentar cargos criminales contra el Juez Campoamor.** Su posición más bien es que el Panel sobre el FEI tiene un poder general para **supervisar** las actuaciones de cualquier FEI nombrado por el propio Panel, y que las serias críticas que ellos hicieron ante el Panel contra el informe del FEI en este caso debieron mover al Panel a ejercitar ese poder supervisor[;] que el Panel como mínimo

**continúa...**

---

[8] **...continuación**
> **debió haber ordenado al FEI reinvestigar la querella en forma adecuada** y luego reconsiderar su decisión de no formular denuncias contra el juez querellado, y (más aun) que el Panel incluso **debió haber relevado al Lic. Torres Jiménez como FEI en este caso, nombrando entonces otro FEI para que hiciera una investigación adecuada** y determinara luego de la misma si debía o no presentar denuncias contra el Juez Campoamor. **Argumentan entonces que el Tribunal puede revisar la decisión del Panel de no tomar ninguna de esta medidas.**

[9] Honorable Angel G. Hermida, Juez Superior.

. . . .

En definitiva, no vemos cómo un FEI en este o cualquier otro caso similar pueda **abdicar totalmente su responsabilidad de hacer una investigación independiente y adecuada** de los hechos que motivaron la querella ante su consideración, y se pueda confirmar con descansar en la evidencia y las determinaciones de hecho de un pleito civil contra la misma parte querellada.

A la luz de todo lo anterior, nos parece inevitable la conclusión de que la "investigación" llevada a cabo por el FEI en este caso fue **seriamente deficiente, por no decir torcida**, que dicha deficiencia resulta totalmente **inexplicable**, y que el FEI no ha ofrecido ninguna justificación adecuada de su **extraño comportamiento**.

Aparte de lo anterior, **encontramos gravísimos errores de derecho** en el razonamiento que contiene el informe del FEI, en el cual éste descansó para concluir que el juez querellado no había incurrido en el delito de apropiación ilegal agravada.
. . . .

. . . [**N**]**o es válido**, como pretende el FEI en su informe, **inferir la ausencia de intención criminal**, y por tanto la ausencia de responsabilidad penal, por el mero hecho de que en este caso unos actos objetivamente constitutivos de delito fueron cometidos en forma abierta. (Negrillas suplidas.)[10]

Si bien el Tribunal Superior llegó a la conclusión de que la labor investigativa del FEI fue "seriamente defectuosa" y "torcida", y que su informe contiene "inexplicables omisiones y graves errores de derecho", no obstante, concluyó que los recurridos carecían de legitimación activa (*standing*) para solicitarle a un Tribunal que obligase al Panel "a tomar medidas contra el FEI"; en particular, para solicitar que se obligara al Panel a nombrar un nuevo FEI en el caso, y ordenase una reinvestigación "adecuada".[11] Por tal razón, a pesar de su extensa sentencia, denegó la expedición del auto de revisión solicitado los recurridos.[12]

De esa determinación, los recurridos acudieron ante nos mediante petición de *certiorari*. El 29 de noviembre de 1994, este Tribunal emitió Resolución denegando expedir el recurso presentado.[13]

---

[10] Apéndice, pp.69-75.

[11] Apéndice, pág. 81.

[12] Irónicamente, el Juez de instancia admitió lo desafortunado de su decisión:

Reconocemos que . . . puede quedar la impresión de que el resultado de este caso es en gran medida contrario al espíritu de la ley que crea el cargo del
**continúa...**

---

[12] **...continuación**
FEI. Después de todo, una de las principales razones de ser de dicha ley es evitar siquiera la apariencia de que los funcionarios de gobierno de . . . influencia pueden cometer delitos impunemente, pues los encargados de acusarlos no se atreven hacerlo. Apéndice, pp. 83-84. (Nota al calce interna omitida.)

[13] Apéndice, pág. 154.

En el ínterin, los recurridos habían solicitado reconsideración al Tribunal Superior. Una vez recibida copia de la Resolución del Tribunal Supremo, los recurridos solicitaron *nuevamente*, obtener acceso al expediente investigativo. Mediante Orden de 28 de abril de 1995, el Tribunal de instancia declaró sin lugar la reconsideración, sin perjuicio de que solicitasen acceso directamente al Panel, **y de denegarse lo solicitado, éstos acudiesen entonces al Tribunal en "*un nuevo recurso de revisión judicial* con relación a dicho asunto únicamente".**[14]

Así las cosas, los recurridos acudieron al Panel para solicitar, *una vez más*, acceso al expediente investigativo del ex juez Campoamor Redín. El 21 de junio de 1995, y nuevamente, el Panel denegó la petición mediante una carta, aclarando, específicamente, que la solicitud "carece de fundamentos **a la luz de los criterios establecidos en el Artículo 16 de la Ley 2** de 23 de febrero de 1988 . . .". Apéndice, pp. 49-50 (énfasis suplido).

El 10 de julio de 1995, los recurridos le enviaron nuevamente otra carta al Panel, mediante la cual solicitaron "reconsideración" de su última denegatoria. Estimamos oportuno transcribir parcialmente el contenido de dicha comunicación:

> En innumerables ocasiones previas hemos expuesto las razones que motivan nuestra solicitud de acceso a información
> . . . .
> Indica su comunicación que nuestra solicitud carece de fundamentos a la luz de los criterios establecidos por el Artículo 16 de la Ley Núm. 2 . . . . Nos parece que esta interpretación del Artículo 16 adolece de serios defectos constitucionales e impone una carga de la prueba sobre el solicitante de la información que, por razón de no tener acceso a los documentos que solicita, no podrá ser descargada adecuadamente.
>
> Contrario lo expuesto en su comunicación, conforme [a]l Artículo 16 y su interpretación . . . constitucional vigente, corresponde al Panel ofrecer acceso a toda la información bajo su control a menos que pueda demostrar que se encuentra presente alguna de las excepciones o reclamos de confidencialidad constitucionalmente reconocidos que rebase el umbral exigido por el derecho constitucional de acceso a información gubernamental. En su comunicación, el Panel deja de exponer detalladamente sus objeciones o reclamos de confidencialidad a aquellos documentos o información específica en el expediente que entienda se encuentran protegidos o cuya divulgación sea contraria al Art. 16.
>
> Conforme [a]l derecho vigente en nuestra jurisdicción, el derecho del pueblo a tener acceso a información en poder del Estado, de jerarquía constitucional, se interpretará a favor del ciudadano y restrictivamente en cuanto a sus limitaciones y exclusiones, mediante un escrutinio acucioso de los intereses apremiantes que se pretenden preservar al mantener la confidencialidad de la información[.] [Citas omitidas.]
> . . . .
>
> **Habiendo terminado el caso de referencia la investigación del Fiscal Especial, rendido su <u>Informe Final</u>, denegada la revisión de la decisión del PFEI y denegado el recurso apelativo para revisar aquella denegatoria, devuelto el mandato, no existiendo la posibilidad del**

---

[14] Apéndice, pp. 58-59. Adicionalmente, el 22 de mayo de 1995, los recurridos solicitaron nuevamente reconsideración de la orden del tribunal de instancia de 28 de abril de 1995. Ésta fue declarada sin lugar por el Tribunal de instancia el 30 de mayo de 1995, mediante otra orden, apuntalando que los recurridos no establecieron justificación para su solicitud, añadiendo, que la "mera curiosidad" no constituye justificación adecuada para lograr acceso al expediente investigativo en cuestión. Apéndice, pp. 133-135.

> nombramiento de un nuevo Fiscal Especial y no quedando pendientes asuntos sobre esta Investigación, aplican en toda su fortaleza los principios constitucionales que otorgan al ciudadano acceso a información bajo el control gubernamental.
>
> Nuestra solicitud de acceso a información es cónsona con los propósitos de la Ley Núm. 2, dirigida a "restaurar la confianza del pueblo en su gobierno y en sus servidores públicos". El acceso a la información en poder del PFEI es el único medio para que la ciudadanía pase juicio sobre la adecuacidad [sic] de sus procedimientos y ejecutorias . . . (Énfasis suplido.)[15]

A esta carta respondió el Panel, el 10 de agosto de 1995, indicando que:

> [E]l derecho de la ciudadanía a acceso a la información investigativa bajo la [Ley Núm. 2] es invocable [sic] cuando no aplican los criterios establecidos por el Artículo 16 de la Ley Número 2 . . . , por vía de excepción, cuando el Panel determina que la divulgación no tendrá las consecuencias enumeradas en los seis subincisos del artículo. La obligación del Panel de proteger la información en el transcurso de una investigación criminal es tan significativa que la misma ley autoriza al Gobernador del Estado Libre Asociado de Puerto Rico destituir a los Miembros por "hacer público un informe cuya divulgación no está autorizada por esta Ley." Artículo 17.
>
> Al Panel se le prohíbe divulgar información de los expedientes investigativos a menos que se determine, inter alia, que no constituye una intromisión irrazonable en la privacidad, y que no expone al público técnicas o procedimientos investigativos que afecten el curso de estas investigaciones.
>
> . . . [S]e desprende que el propósito en solicitar acceso al expediente del Lcdo. Fernando Campoamor Redín está dirigida [sic] a "que la ciudadanía pase juicio sobre la adecuacidad [sic] de sus [del Panel] procedimientos y ejecutorias". La misma ley basada en el modelo federal de proteger las técnicas investigativas [sic] del Negociado de Investigaciones Federales (el "F.B.I.") expresamente prohíbe exponer al público las técnicas y procedimientos investigativos. Además, se nos imposibilita determinar, basado en las razones que fundamentan su solicitud, que el acceso al expediente investigativo no constituya una intromisión irrazonable en la privacidad del investigado. [Citas omitidas.][16]

Por segunda ocasión, los recurridos presentaron el 8 de septiembre de 1995 una petición de "revisión" ante el Tribunal Superior de San Juan.

Mientras tanto, la Comisión de Disciplina y de Separación del Servicio por Razón de Salud de Jueces emitió una resolución el 25 de enero de 1996, determinando que la conducta observada por el Juez Campoamor Redín "ciertamente" fue constitutiva de "violaciones al Código Penal, por los delitos de apropiación ilegal agravada, usurpación, y daños agravados".[17]

Luego de varios trámites procesales, el tribunal de instancia emitió una "orden" el 30 de abril de 1996, dictaminándole al Panel que elevara el expediente de la investigación

---

[15] Apéndice, pp. 52-54.

[16] Apéndice, pp. 55-56. Mediante este escrito, claramente, el Panel intimó que las excepciones del Art. 16 de la Ley Núm. 2 aplicables al caso de autos, son los incisos (c) y (e). Véase 3 L.P.R.A. sec. 99w. A saber, el inciso (c) impide al Panel dar acceso a su expediente en aquellos casos en que ello pueda crear una intromisión irrazonable en la privacidad del investigado; y el inciso (e) lo impide cuando dar acceso al expediente pueda exponer al público técnicas o procedimientos investigativos que afecten el curso de este tipo de investigación. Id.

[17] Véase Apéndice, pág. 159, y Anejo 1 que acompaña el Alegato del Recurrido en el caso de autos.

relativa al Juez Campoamor Redín. Justificó su determinación citando la jurisprudencia[18] que indica que para que un tribunal pueda evaluar un reclamo de ésta índole, es necesario que sea el mismo Tribunal el que examine en cámara los documentos que el Panel alega son privilegiados. Apéndice, pp. 160-161.

Así las cosas, el recurso de revisión iniciado en el Tribunal Superior fue referido al Tribunal de Circuito de Apelaciones por orden administrativa de 19 de junio de 1996, y conforme a la nueva Ley de Judicatura. Véase 4 L.P.R.A. 23(f). Oportunamente, el 10 de marzo de 1997, el Tribunal de Circuito de Apelaciones (en adelante, TCA), mediante resolución, determinó que procedía "darle validez y efecto a la orden dictada el 30 de abril de 1996, por el Tribunal de Primera Instancia".[19] En su resolución, además, el TCA dispuso que examinaría los documentos "en privado" y determinaría si las razones ofrecidas por el Panel para negar acceso de los documentos, se justificaban o no, tomando en consideración lo dispuesto en el Art. 16, incisos (c) y (e) de la Ley Núm. 2. Por último, el TCA concluyó expresando lo siguiente: "Es ahora, ante este Foro que existe la posibilidad de una decisión concediendo la solicitud de los [recurridos]". Apéndice, pág. 168 (Énfasis suplido.)

Finalmente, luego de varios trámites apelativos, el TCA decidió **denegar el auto de revisión judicial** mediante resolución, el 15 de enero de 1998.[20] En su resolución, **resolvió** que el recurso de revisión judicial de una decisión administrativa **"no es el apropiado para adjudicar una solicitud para obtener la información relacionada a la investigación conducida por el PFEI . . .".** Apéndice, pág. 3. (Énfasis suplido.)

Para justificar su decisión el TCA expuso como fundamento que su jurisdicción revisora administrativa de la denegatoria del Panel dependía, en primer lugar, de que éste haya emitido una "orden o resolución final" administrativa;[21] y, en segundo lugar, que dicha orden o resolución final del Panel fuese emitida luego de haberse celebrado un procedimiento adjudicativo formal administrativo que estuviese legítimamente enmarcado dentro de la jurisdicción, competencia y autoridad estatutaria del Panel. Concluyó finalmente que no tenía jurisdicción para revisar judicialmente la denegatoria del Panel debido a que las cartas

---

[18] *Santiago v. Bobb y El Mundo, Inc.*, 117 D.P.R. 153, 162, y casos allí citados.

[19] Resolución de 10 de marzo de 1997, dictada por el Panel integrado por su presidente, Juez Sánchez Martínez, y los Jueces Broco Oliveras y Urgell Cuebas. Apéndice, pp. 165-168.

[20] El TCA le concedió la oportunidad al ex Juez Campoamor Redín a efectuar una comparecencia especial en el caso de autos. En esencia, el Lic. Campoamor Redín adujo que es a él a quien le corresponde proteger su derecho a la intimidad y que sólo él puede renunciar al mismo.

[21] El TCA definió "orden o resolución final" como una determinación administrativa que, en esencia, incluye "unas determinaciones de hechos y las conclusiones de derecho de la decisión" tomada que, a su vez, advierta a la parte adversamente afectada "del derecho de solicitar reconsideración". *Junta Exam. Tec. Méd. v. Elías* et al., 144 D.P.R. ___ (1997), 97 J.T.S. 141, pág. 320.

denegando acceso a los documentos solicitados no cumplían con la definición de "orden o resolución final" administrativa; es decir, no incluían conclusiones de hechos y derecho. Añadió, además, que el Panel en momento alguno celebró vista formal adjudicativa para resolver la solicitud de los recurridos, pero que tampoco podía hacerlo legítimamente en este caso ya que su determinación no surgió como parte de la ejecución de una investigación criminal o de un procesamiento criminal que, según el TCA, es la única función para la cual le encomienda o concede autoridad la ley orgánica del Panel. En otras palabras, concluyó que un procedimiento adjudicativo formal sobre ese asunto no está legítimamente enmarcado dentro de la jurisdicción, competencia y autoridad estatutaria del Panel.

**Por último, el TCA subrayó que la resolución del caso de marras "requiere el examen y evaluación de los documentos del expediente por un organismo independiente, pues hay que pasar juicio sobre éstos y determinar si deben mantenerse confidenciales . . . . [Y e]n este proceso es necesario recibir y evaluar,** en instancia primera, **la prueba de las partes".[22] Añadió que ni la Ley de la Judicatura, ni la doctrina jurídica sobre la naturaleza de los procedimientos apelativos, ni el Reglamento del TCA contempla que éste reciba prueba directamente, salvo en los casos de** *habeas corpus* **y** *mandamus*.[23] **"Al contrario, ... nuestra función se limita a resolver si la determinación judicial o administrativa es correcta en derecho. El [TPI], como tribunal de jurisdicción general, es el ente idóneo para recibir y evaluar la prueba de las partes".[24] Concluyó, por tanto, que lo procedente era remitir el caso al TPI "para que éste entienda en la controversia como un juicio** *de novo*, **reciba la evidencia, formule las determinaciones de hechos y conclusiones de derecho requeridas y adjudique los derechos que le correspondan a las partes".[25]**

> **En resumen, la controversia suscitada por las partes no cualifica para adjudicación por este Foro apelativo, un recurso de revisión judicial sobre decisión administrativa, ya que no es una revisión de una orden o resolución dictada en el ejercicio de la autoridad concedida al PFEI por su ley habilitadora, ni existe un récord evidenciario creado al nivel administrativo sobre el cual podamos basar nuestra revisión. En adición, nos es persuasivo que bajo el [*Freedom of Information Act*],[26] . . . las controversias sobre acceso a información se dilucidan mediante juicio** *de novo* **ante los tribunales de primera instancia y no ante las cortes apelativas.[27]**

**Devolvió, por tanto, el caso al Tribunal de Primera Instancia indicando que aunque de ordinario lo procedente era desestimar el caso, sin embargo, "en consideración del historial procesal" del mismo, lo devolvería al Tribunal de Primera Instancia para ser ventilado por**

---

[22] Apéndice, pp. 8-9. (Énfasis suplido.)

[23] Un tribunal apelativo no puede admitir prueba presentada por vez primera ante dicho tribunal. *Catoni v. Aybar*, 60 D.P.R. 645 (1942); R. Hernández Colón, *Derecho Procesal Civil* § 5112, pág. 327 (1997).

[24] Apéndice, pág. 9.

[25] *Id.*

[26] 5 U.S.C. sec. 552 *et seq.* (en adelante, FOIA).

juicio *de novo.* **No obstante su determinación de no expedir el auto de revisión judicial, el TCA incorporó a su resolución una exposición jurídica sumamente extensa, discutiendo, entre otras cosas, el alcance del Artículo 16 de la Ley Núm. 2,** *supra.*[28]

**De esta determinación acudió oportunamente ante nos el Panel, el 6 de abril de 1998, mediante recurso de** *certiorari.*[29] **Expedimos el auto el 19 de junio de 1998. Habiendo comparecido las partes con sus respectivos alegatos, procedemos a resolver.**

II

---

[27] *Id.,* pág. 11.

[28] El TCA comenzó su exposición indicando que:

> Toda vez que estamos refiriendo el caso al Tribunal de Primera Instancia para su consideración y, dado el hecho de que entre las partes se han suscitado
> **continúa...**

---

[28] **...continuación**

> criterios conflictivos sobre los procedimientos a seguirse para la aplicabilidad de las excepciones incluidas en el Art. 16 [de la Ley Núm. 2], **es prudente que expongamos el estado de las doctrinas jurídicas aplicables, de manera que sirvan de guía a dicho foro en su ulterior consideración del caso,** se [*sic*] pueda determinar cuáles documentos, o partes de éstos, deben mantenerse confidenciales. **Por eso es necesario establecer un procedimiento** para que se identifiquen apropiadamente los mismos por el PFEI. (Énfasis suplido.) *Id.*

[29] **La parte peticionaria señaló la comisión de dos (2) errores:**

> *Primer Error*: **Incidió el Honorable Tribunal de Circuito de Apelaciones, al exponer unas directrices o guías a seguirse en un juicio de novo, aún [*sic*] cuando no existía una controversia real, por éste carecer de jurisdicción para entender en los méritos del recurso. Además, esas directrices constituyen una mera opinión consultiva, que afectan los derechos o prerrogativas de la Rama Legislativa, lo cual es impermisible [*sic*] en nuestro Sistema de Derecho Constitucional vigente.**

> *Segundo Error*: **Incidió el Honorable Tribunal de Circuito de Apelaciones, al no resolver que bajo la doctrina constitucional de acceso a información y/o documentos, existe una exclusión de divulgación pública en un expediente relacionado con una investigación legítima de naturaleza criminal bajo el Artículo 16, de la Ley del Fiscal Especial Independiente, 3 L.P.R.A. sec. 99w, y [el] Freedom of Information Act (FOIA), 5 U.S.C. sec. 552.**

De entrada es importante notar la evidente indisposición demostrada por el Panel y el TPI de entender la solicitud de los recurridos apropiadamente, a lo largo de este litigio. En vista de que el TCA entendió procedente denegar el auto de revisión judicial y devolver el caso al TPI para ser resuelto en sus méritos, entendemos necesario aclarar, determinar y resolver cuál es el foro que en realidad posee jurisdicción primaria para adjudicar la solicitud de los recurridos: el foro administrativo o el judicial.

### A. Naturaleza del Panel

Debemos resolver primero si el Panel constituye propiamente un foro administrativo, o sea, si puede considerarse como una "agencia", según lo define la Ley de Procedimiento Administrativo Uniforme (LPAU).[30] Veamos.

El Panel es foro u organismo independiente, adscrito al Departamento de Justicia, cuyas funciones se circunscriben básicamente a designar y nombrar Fiscales Especiales en los casos aplicables,[31] determinar la jurisdicción de éstos,[32] y supervisarlos debidamente para que éstos cumplan sus encomiendas en término y de manera competente.[33] La Ley Núm. 2 indica que el Panel fue creado con el fin de "erradicar y penalizar cualquier comportamiento delictuoso o indebido por cualquier funcionario gubernamental" y, a su vez, "garantizar la absoluta objetividad de investigaciones contra altos funcionarios del Gobierno". Exposición de Motivos, Leyes de Puerto Rico, 1988, pág. 6.

> **El mecanismo de Fiscal Especial Independiente,** bajo la supervisión de un Panel nombrado por el Gobernador del Estado Libre Asociado de Puerto Rico y compuesto exclusivamente por Ex Jueces del Tribunal Supremo o Superior o de ambos, garantiza la absoluta objetividad de investigaciones contra altos funcionarios del Gobierno. **De igual importancia, la institución del Fiscal Especial Independiente y del Panel provee un foro neutral e independiente para dilucidar palpablemente ante el pueblo supuestos o reales actos indebidos atribuibles a funcionarios gubernamentales, creándole así a funcionarios honestos un medio efectivo para preservar su integridad y reputación.** *Id.* (Énfasis suplido.)

Básicamente, el Panel entra en función de dos maneras. Primero, entra en función cuando, luego de que el Secretario (o la Secretaria) de Justicia lleve a cabo una "investigación preliminar", haga la determinación de que existe causa suficiente para creer que un funcionario gubernamental ha cometido delito,[34] basándose en información

---

[30] 3 L.P.R.A. sec. 2101 *et seq.*

[31] 3 L.P.R.A. sec. 99r(1).
[32] 3 L.P.R.A. sec. 99r(2) y (3).
[33] 3 L.P.R.A. sec. 99s(5).

[34] Esto es, por cometer "cualquier delito grave y menos grave incluido en la misma transacción o evento[;] y los delitos contra los derechos civiles, la función pública y el erario público ...". 3 L.P.R.A. sec. 99k(1).

obtenida bajo juramento. El Secretario luego rinde un informe detallando su investigación al Panel, haciéndole una recomendación sobre si procede o no la designación de un FEI. El Secretario viene también obligado a referirle al Panel el expediente completo del caso. El Panel entonces tiene discreción para nombrar un FEI y ordenar la investigación. **3 L.P.R.A. ss. 99k (1) y (2), 99L y 99r(1)(a). Segundo, bajo ciertas circunstancias, la ley le concede discreción al Panel para que —sin previa intervención del Secretario o Secretaria de Justicia— nombre a un FEI, siempre que el Panel haya obtenido la información que da base al nombramiento del FEI de una "fuente de alta credibilidad". Véase 3 L.P.R.A. sec. 99m, 99p y 99r(1)(c).**

**La LPAU define el término "agencia" como sigue:**

> **(a) *Agencia*.—Significa cualquier junta, cuerpo, tribunal examinador, corporación pública, comisión, oficina independiente, división, administración, negociado, departamento, autoridad, funcionario, persona, entidad o cualquier instrumentalidad del Estado Libre Asociado de Puerto Rico u organismo administrativo** autorizado por ley a llevar a cabo funciones **de reglamentar, investigar, o que pueda emitir una decisión, o con facultades para expedir licencias, certificados, permisos, concesiones, acreditaciones, privilegios, franquicias, acusar o adjudicar . . . . 3 L.P.R.A. sec. 2102(a). (Énfasis suplido.)**

**Según la antes citada sección, puede apreciarse que la definición del término "agencia" es una sumamente amplia. De hecho, es tan amplia que prácticamente cobija a todas y cada una de las agencias administrativas del Estado Libre Asociado, "las cuales se encuentran ubicadas en la rama ejecutiva del gobierno".** D. Fernández, *Derecho Administrativo y Ley de Procedimiento Administrativo Uniforme* § 1.1, pág. 9 (2ª edición, 2001). **Surge asimismo que la determinación de si un foro es o no una "agencia" claramente gira en torno a las funciones que esté legalmente** "autorizada" **a llevar a cabo.[35] Es decir, la disyuntiva de si una agencia, cuerpo, instrumentalidad, funcionario, oficina, etc., debe ser o no considerada una "agencia", ha de resolverse en atención a la** autoridad **legal que tiene para actuar o disponer de un asunto de manera final y obligatoria.** Davis y Pierce, *op. cit.*, § 1.2.

**Resolvemos que el Panel es una "agencia" según definido por la LPAU. Ello, en vista de que el Panel es una "instrumentalidad del Estado Libre Asociado de Puerto Rico" que posee** amplia autoridad y discreción **para nombrar y supervisar Fiscales Especiales Independientes, en los casos específicamente determinados por ley. Debemos distinguir, sin embargo, que el Panel no es quien investiga los imputados actos criminales, ni tampoco es quien decide radicar cargos criminales; ello le corresponde única y exclusivamente a un FEI. La encomienda legal del Panel es**

---

[35] "In determining whether some entity is an agency... the most important word in the definition may be 'authority'". Kenneth Culp Davis y Richard J. Pierce, Jr., *Administrative Law Treatise*, § 1.2, (1994).

determinar la procedencia del nombramiento de un FEI, y desde luego, supervisarlo. Es importante señalar, además, que la Ley Núm. 2 dispone que la determinación final que haga el Panel de nombrar o no a un FEI es final y firme, por lo cual "no podrá radicarse querella nuevamente por los mismos hechos". 3 L.P.R.A. sec. 99k(5).

Por lo tanto, es forzoso concluir que el Panel cumple con la amplia definición de "agencia" provista por la LPAU.

### B. Foro con jurisdicción

Como indicamos previamente, debemos resolver cuál es el foro que tiene jurisdicción primaria en casos como el de autos. Es decir, debemos aclarar en el caso de autos cuál era el foro que, en origen, debió asumir jurisdicción primaria para atender la solicitud de los recurridos: el foro administrativo (*i.e.*, el Panel), o el tribunal de instancia, según sugiere el TCA. Para contestar la interrogante debemos exponer y distinguir los límites de la doctrina de jurisdicción primaria y la de agotamiento de remedios administrativos.

"La doctrina de jurisdicción primaria y la de agotamiento de remedios administrativos guardan relación íntima. Necesitan, no obstante, ser diferenciadas[.]"D. Fernández, *op. cit.*, § 8.7, pág. 464. Si bien hemos indicado que ambas son germanas y persiguen el mismo fin,[36] las mismas no deben confundirse. *E.L.A. v. 12,974.78 Metros Cuadrados*, 90 D.P.R. 506, 513 (1964).[37]

### 1. Doctrina de agotamiento de remedios administrativos

La doctrina de agotamiento de remedios administrativos requiere que una persona que desee obtener un remedio y acude primero a la agencia que posea jurisdicción sobre la cuestión, tendrá la obligación, como regla general, de utilizar todos los recursos, procedimientos, y las vías que administrativamente estén disponibles, antes de recurrir a la rama judicial. Como ya hemos indicado anteriormente:

> A diferencia de la jurisdicción primaria, la doctrina de agotamiento de remedios administrativos opera en una etapa posterior del procedimiento ante la agencia. El principio de agotamiento requiere que el que desee obtener un remedio en una agencia utilice todas las vías administrativas disponibles antes de recurrir al tribunal. Bajo esta doctrina la revisión judicial de la decisión administrativa no está disponible hasta que la parte afectada utilice todos los procedimientos correctivos ofrecidos por el proceso administrativo. El propósito de esta norma es establecer el momento idóneo en el cual el proceso judicial debe intervenir en una controversia sometida previamente a la esfera administrativa. *Colón v. Méndez, Depto. Recursos Naturales*, 130 D.P.R. 433, 442-43 (1992). (Énfasis suplido; citas internas omitidas.)

Una vez la persona interesada haya agotado todos los remedios provistos por la agencia, entonces el acceso al Tribunal de Circuito de Apelaciones estará disponible para una parte

---

[36] Esto es, el fin de poner orden en la administración de la justicia y armonizar el funcionamiento de la rama judicial con el de la rama ejecutiva.

[37] Véase además *Brunet Justiniano v. Hernández Colón*, 130 D.P.R. 248 (1992); *Mercado v. U.P.R.*, 128 D.P.R. 273 (1991); *Delgado v. Nazario*, 121 D.P.R. 347 (1988); *Rivera v. E.L.A.*, 121 D.P.R. 582 (1988); *García Cabán v. U.P.R.*, 120 D.P.R. 167 (1987).

adversamente afectada que desee solicitar la revisión judicial de la orden o resolución final emitida por dicha agencia. *Véase* 3 L.P.R.A. sec. 2172.

Si bien las doctrinas de jurisdicción primaria como la de agotamiento de remedios administrativo han sido elaboradas judicialmente, el legislador puertorriqueño específicamente adoptó en nuestro ordenamiento la doctrina de agotamiento de remedios administrativos en la sección 4.3 de la LPAU. *Véase* 3 L.P.R.A. sec. 2173. Según dicha sección, el tribunal podrá relevar a un peticionario de tener que agotar alguno o todos los remedios administrativos provistos, sólo bajo cinco (5) supuestos: 1) en el caso de que dicho remedio sea inadecuado; 2) cuando requerir el agotamiento resulte en un daño irreparable al promovente y en el balance de intereses no se justifica agotar dichos remedios; 3) cuando se alegue la violación sustancial de derechos sustanciales; 4) cuando sea inútil agotar los remedios administrativos por la dilación excesiva en los procedimientos; o 5) cuando sea un asunto estrictamente de derecho y es innecesaria la pericia administrativa. *Id.*[38]

En resumen, la norma de agotamiento de remedios administrativos, de ordinario, se aplica en casos en los cuales una parte, que instó o tiene instada alguna acción ante una agencia u organismo administrativo, recurre luego ante un tribunal sin antes haber completado todo el trámite administrativo disponible. Es decir, la doctrina usualmente se invoca para cuestionar la acción judicial de un litigante que originalmente acudió a un procedimiento administrativo o era parte de éste, pero habiendo estado allí, no agotó todos los recursos disponibles a su favor.

### 2. Doctrina de jurisdicción primaria

Por su parte, la doctrina de jurisdicción primaria ayuda a los tribunales a determinar qué organismo debe hacer una determinación *inicial* del asunto en controversia. *Id.*, pág. 511.[39] Es decir, determina si la acción debe ser presentada ante la agencia concernida o ante el tribunal de primera instancia.[40] Ello es así debido a que "[e]l punto de partida es la existencia de una jurisdicción concurrente entre el tribunal y la agencia. Empero, [al aplicar la doctrina de jurisdicción primaria] se le cede la primacía al organismo administrativo". D. Fernández, *op. cit.*, § 8.3, pág. 435. (Énfasis suplido; cita al calce omitida.)[41] Dicho de

---

[38] Para una discusión extensiva sobre la aplicación de éstas excepciones estatutarias en la casuística, *véase* D. Fernández, *op. cit.*, § 8.8.

[39] Como bien señala el profesor Davis: "The doctrine of primary jurisdiction usually does nothing more than allocate power between courts and agencies to make *initial* determinations. It usually does not allocate power to make *final* determinations, although occasionally it does." Davis, *Administrative Law Treatise* § 22:1, pág. 82 (1983).

[40] La doctrina de jurisdicción primaria tiene, a su vez, dos (2) vertientes; a saber: la jurisdicción primaria exclusiva y la jurisdicción primara concurrente. Véase *Colón v. Méndez, Depto. Recursos Naturales*, *supra*, pág. 442; D. Fernández, *op. cit.*, § 8.4.

[41] En *E.L.A. v. 12,974.78 Metros Cuadrados*, *supra*,

continúa...

otra manera, "[l]a verdadera jurisdicción primaria ocurre tan sólo cuando existe jurisdicción concurrente entre el [foro] administrativo y el sistema judicial...". *Ortiz v. Coop. Ahorro y Crédito*, 120 D.P.R. 253 (1987), y casos allí citado. De hecho, el Tribunal Supremo de los Estados Unidos ha expresado que la aplicación de la doctrina no implica que el ejercicio de jurisdicción del Tribunal ha sido eliminado, sino meramente aplazado o "pospuesto". *U.S. v. Philadelphia National Bank*, 374 U.S. 321, 353 (1963). Del mismo modo, hemos expresado que la doctrina simplemente atiende "una cuestión de prioridad de jurisdicción". *E.L.A. v. 12,974.78 Metros Cuadrados*, *supra*, pág. 511.

El fundamento principal de la doctrina es que las agencias se consideran mejor equipadas que los tribunales debido a su especialización y al conocimiento obtenido a través de la experiencia. D. Fernández, *op. cit.*, § 8.3, pág. 434; Davis, *op. cit.* § 22:1. Consecuentemente, "[l]a aplicación de la doctrina significa la exclusión de la acción judicial para así obtener los presuntos beneficios que se derivan de la interacción con el ente administrativo especializado". *Id.*, pág. 434-35.[42] Por tanto, los jueces deben aplicar la misma, como regla general, en casos en los cuales el peritaje de la agencia sea indispensable para resolver la controversia, ya que los "tribunales [son] de justicia y no centros académicos para dirimir sutilezas técnicas". *Quiñónez v. A.C.A.A.*, 102 D.P.R. 746, 749-50 (1974).

Por otro lado, debemos señalar que si bien es cierto que, en teoría, una controversia relativa a esta doctrina puede suscitarse tanto ante un tribunal como ante un organismo administrativo, lo usual es que la doctrina sea alegada, no en el procedimiento administrativo, **sino** en el curso de un litigio judicial; **es decir,** son

---

[41] ...continuación

explicamos el fin que persigue la doctrina de jurisdicción primaria: dijimos allí que "[s]i los tribunales fuesen a hacer en primera instancia las determinaciones que los estatutos especifican que han de hacerse por los organismos administrativos y por los administradores, se crearía tal confusión que el derecho administrativo sería cosa imposible de administrar ejecutivamente y judicialmente". *Id.*, p. 512.

[42] No obstante, se ha reconocido que la doctrina de jurisdicción primaria protege también el principio cardinal de uniformidad; es decir, persigue "una mayor racionalidad en el diseño de las normas" para así evitar conflictos. D. Fernández, *op. cit.*, § 8.3, pág. 434. Como señalan los profesores Davis y Pierce:

> In many circumstances, referral of a close and difficult issue to an agency for initial resolution (1) increases the chances of high quality decision, (2) decreases the potential for conflicts among legal institutions, and (3) increases the likelihood that unavoidable conflicts will be resolved in a manner that gives proper respect to the respective responsibilities of the many institutions of

los tribunales **los que con frecuencia aplican la doctrina para señalar que la responsabilidad** *inicial* **de adjudicar una controversia debe recaer en el foro administrativo, por éste poseer la pericia necesaria para resolverla.** Davis y Pierce, *op. cit*., § 14.1, pág. 271; Davis, *op. cit.*, pág. 82.

**Asimismo, debemos señalar que cuando la acción se haya presentado** primeramente (o directamente) ante el tribunal, haciendo caso omiso de la agencia, no habrá duda de que se trata de un asunto de jurisdicción primaria, **y** *no* **de agotamiento de remedios administrativos.** D. Fernández, *op. cit*., § 8.7, pág. 468. (Énfasis suplido.)[43]

**En términos prácticos, la doctrina de jurisdicción primaria exige que los tribunales emprendan la tarea de examinar los alcances de la ley habilitadora de una agencia, y determinar si el asunto cae estrictamente dentro del ámbito judicial;**[44] **asimismo les exige que ponderen**

_____

federal and state government. Davis y Pierce, *op. cit.*, § 14.6, pág. 301.

[43] A diferencia, como veremos *infra*, la doctrina de agotamiento de remedios administrativos ("exhaustion", en inglés) es de aplicación cuando la parte acude directa y originalmente a la agencia, pero luego decide recurrir al tribunal prematuramente. Como bien apunta el profesor Schwartz, *Administrative Law* § 8.27, pp. 524-525:

> The exhaustion doctrine prevents premature judicial interference with administrative proceedings, while **the primary jurisdiction doctrine denies jurisdiction where agency proceedings have not yet begun.** Exhaustion contemplates a situation where some administrative action has begun, but has not yet been completed; primary jurisdiction situations arise where a plaintiff, **in the absence of pending agency proceedings,** invokes the original jurisdiction of a court". (Énfasis suplido; notas al calce internas omitidas.)

[44] **En realidad, no existe una fórmula precisa para saber cuándo aplicar o no aplicar alguna excepción de la doctrina; por tanto, los tribunales tienen que hacer** una

continúa...

_____

[44] ...continuación

evaluación pragmática, **sobre las ventajas y desventajas que implicaría reconocerle a una agencia la facultad adjudicativa inicial en cada caso.** *Id.*, pág. 272; *U.S. v. Western Pacific R.R. Co*., 352 U.S. 59, 64 (1956). **Se ha sugerido, por tanto, la importancia de tomar en consideración varios factores:**

> **In making such determinations, courts [should] consider several factors, including (1)** the extent to which the agency's specialized expertise makes it a preferable forum for resolving the issue, **(2) the need for uniform resolution of the issue, and (3) the potential that judicial resolution of the issue will have an adverse impact of the**

y determinen si es imprescindible y necesario que se resuelva a favor de que intervenga inicialmente la agencia. *Id.*, § 8.4, pág. 443. Como bien apunta el profesor Demetrio Fernández: "La cuestión jurisdiccional es recurrente y exige precisión y claridad en sus soluciones. La responsabilidad primaria recae en los tribunales **por cuanto son los facultados a interpretar los estatutos y descifrar las confusiones creadas por éstos**". *Id.*, pág. 444. (Énfasis suplido.) Y si en el descargo de esa responsabilidad los tribunales resuelven que es de aplicación la doctrina de jurisdicción primaria en un caso específico, entonces "[t]he courts are divested of whatever original jurisdiction they would otherwise possess; their function in the cases concerned is limited to judicial review. This result follows by operation of the primary jurisdiction doctrine; no statute is needed to accomplish it . . .". Schwartz, *op. cit.*, pág. 527.

Ahora bien, la doctrina no es una camisa de fuerza, y bajo ciertas circunstancias, hemos reconocido su inaplicabilidad.[45] Así, pues, no aplica cuando "la naturaleza de la causa de acción presentada y el remedio solicitado destacan que no se presentan cuestiones de derecho que exijan el ejercicio de discreción y de peritaje administrativo", es decir, cuando la cuestión que se plantea sea "puramente judicial". D. Fernández, *op. cit.*, § 8.4, pág. 443-44. En tales casos, se entiende que las agencias carecen de los poderes y de los instrumentos para diseñar el remedio solicitado. *Id.* Y si "surge claramente que no hay jurisdicción, ningún beneficio se obtiene al obligar al litigante a mantenerse en la agencia". *Ortiz v. Cooperativa de Ahorro y Crédito*, *supra,* pág. 264. En fin, "[e]l dictamen de si existe o no jurisdicción dependerá en gran medida del ejercicio de su pericia administrativa".[46]

Un ejemplo de ello fue *Ortiz v. Cooperativa de Ahorro y Crédito*, *supra*.[47] Allí resolvimos que la doctrina de jurisdicción primaria no era de aplicación cuando se trataba de "una

---

agency's performance of its regulatory responsibilities. Davis y Pierce, *op. cit.*, § 14.1, pág. 272. (Énfasis suplido.)

---

[45] Para una discusión más completa sobre las distintas excepciones que a la doctrina de jurisdicción primaria se han reconocido jurisprudencialmente en otras jurisdicciones, véase Schwartz, *op. cit.* §§ 8.28-8.30.

[46] *Vélez Ramírez v. Romero Barceló*, 112 D.P.R. 716, 727 (1982). En *Vélez Ramírez* se aplicó, sin embargo, la doctrina de agotamiento de remedios administrativos. *Véase además* D. Fernández, *op. cit.*, § 8.8, pág. 477-78.

[47] **En este caso un empleado de una cooperativa presentó**

continúa...

---

[47] ...continuación

reclamación estrictamente privada para cuya solución la agencia no [tenía] ningún conocimiento especializado". *Id.*, pág. 264. Dijimos que en tales casos, "son los tribunales los llamados a dirimir la controversia". *Id.*

En resumen, la regla general es que un tribunal debe aplicar la doctrina de jurisdicción primaria en todo caso en el cual el peritaje de una agencia sea indispensable para resolver la controversia. A modo de excepción, si la cuestión envuelta es estrictamente de derecho, por lo cual resulta innecesaria la pericia administrativa, el tribunal retendrá la jurisdicción.

### III

De un examen detallado de nuestra jurisprudencia surge que las controversias relativas al derecho de los ciudadanos a solicitar acceso a información pública en manos del gobierno tienen, por lo menos, dos (2) vertientes o modalidades: 1) en los casos que caen bajo la primera modalidad, el asunto sobre acceso a información pública nunca es la controversia principal, sino que surge como un asunto incidental en el caso; es decir, surge como una cuestión colateral o contingente a una controversia principal, separada y distinta;[48] 2) bajo la segunda modalidad de controversias sobre acceso a información pública ocurre cuando una persona acude ante un foro adjudicativo exclusivamente para ejercer su derecho constitucional de acceso privado a información pública.

El caso de *López Vives v. Policía de P.R., supra*, es un ejemplo de la primera modalidad. Se trataba de un agente de la Policía de Puerto Rico. Basándose en un "informe confidencial", el Superintendente de la Policía separó al agente del cuerpo policíaco "debido a sus hábitos, confiabilidad y actitudes". Por entender que su despido fue ilegal, el cadete apeló la decisión ante la Junta de Apelaciones del Sistema de Administración de Personal (J.A.S.A.P.), solicitando su reinstalación. No obstante, el foro administrativo confirmó la

---

demanda en el tribunal contra su patrono por haber sido destituido sin que previamente se le formularan cargos. La cooperativa solicitó la desestimación por entender que la jurisdicción en primera instancia era la Oficina del Inspector de Cooperativas (OIC), cuya decisión era revisable, a su vez, por la Junta de Apelaciones, establecida por la ley General de Sociedades Cooperativas de Puerto Rico. El tribunal de instancia desestimó la demanda y ordenó el traslado a la OIC. Revocamos por entender que los asuntos planteados en el caso involucraban derechos estrictamente contractuales y estatutarios. Indicamos que "[a]l tribunal le corresponde, en primer lugar, resolver el caso". *Ortiz v. Cooperativa de Ahorro y Crédito, supra,* pág. 264.

---

[48] Véanse, *e.g., Angueira v. J.L.B.P.,* res. el 11 de enero de 2000, 150 D.P.R. __, 2000 T.S.P.R. 2, 2000 J.T.S. 1; *Angueira v. J.L.B.P.,* res. el 29 de junio de 2000 (en reconsideración), 151 D.P.R. __, 2000 T.S.P.R. 103, 2000 J.T.S. 109; *Torres Ramos v. Policía de P.R.,* res. el 30 de junio de 1997, 143

actuación del Superintendente, basándose nuevamente en el "informe confidencial" preparado por la Policía. En vista de la determinación de J.A.S.A.P., el agente alegó –de manera colateral– tener derecho a inspeccionar el "informe confidencial", y solicitó acceso al mismo con el fin de cuestionarlo e impugnarlo. Sin embargo, el acceso le fue denegado porque supuestamente su "confidencialidad estaba ampliamente justificada".

Como podrá apreciarse, la controversia principal allí era si la suspensión del agente fue efectuada conforme a derecho. Por lo tanto, la J.A.S.A.P. era claramente el foro con jurisdicción primaria, por poseer el *expertise* necesario para dilucidar ese asunto. En cambio, el asunto sobre acceso a información pública surgió meramente como un incidente en la etapa apelativa del litigio administrativo.

Asimismo, en *Torres Ramos v. Policía de P.R., supra*, se trataba de un cadete que solicitó admisión a la Policía de Puerto Rico. Cuando fue rechazado, el aspirante apeló ante J.A.S.A.P. cuestionando dicha determinación, no obstante el foro apelativo confirmó. El cadete entonces solicitó inspeccionar la prueba del expediente en la cual se basó la Policía y J.A.S.A.P., mas le fue negado. Nuevamente, el asunto sobre acceso a información pública surgió incidentalmente, siendo la controversia principal la legalidad de la denegatoria de admisión al cuerpo policíaco, cuestión que claramente caía bajo la jurisdicción del foro administrativo, es decir, J.A.S.A.P.

La segunda modalidad de controversias sobre acceso a información pública ocurre cuando una persona acude ante un foro adjudicativo con el único objetivo de lograr acceso a información pública en manos del gobierno, es decir, exclusivamente para ejercer su derecho constitucional de acceso privado a información pública.[49] En estos casos, el asunto sobre acceso a información es la cuestión o controversia principal a resolverse por el foro adjudicativo.

Esta distinción es fundamental para hacer la determinación de qué foro tiene jurisdicción primaria en casos de acceso a información pública. Así, por ejemplo, en una controversia sobre acceso a información pública bajo la segunda modalidad, la controversia a resolverse por el foro se reduce estrictamente a un asunto de derecho, a saber: si la persona interesada tiene derecho a obtener la información pública solicitada, a la luz de las leyes, la jurisprudencia o algún reglamento. Como indicamos previamente, la doctrina de jurisdicción primaria sólo aplica en los casos en los cuales el peritaje de una agencia sea indispensable para resolver la controversia principal, pero si la cuestión envuelta es estrictamente de derecho, el tribunal retendrá la jurisdicción, ya que la pericia administrativa resultaría innecesaria.

---

D.P.R. \_\_, 97 J.T.S. 112; *Silva Iglecia v. F.E.I.,* 137 D.P.R. 821 (1995); *López Vives v. Policía de P.R.,* 118 D.P.R. 219 (1987).

[49] Véanse, *e.g., Guadalupe v. Saldaña, Pres. U.P.R.,* 133 D.P.R. 42 (1993); *Santiago v. Bobb y El Mundo, Inc., supra; Soto v. Srio. de Justicia,* 112 D.P.R. 463 (1982); *Dávila v. Superintendente de Elecciones,* 82 D.P.R. 265 (1960); *Prensa Insular de P.R. v. Cordero, Auditor,* 67 D.P.R. 89 (1947).

Por lo tanto, debido a que las controversias de acceso a información pública bajo la segunda modalidad **giran** exclusivamente **en torno a una cuestión jurídica, "son los tribunales los llamados a dirimir la controversia".** *Ortiz v. Cooperativa de Ahorro y Crédito, supra*, **pág. 264. En consecuencia, resolvemos que, como regla general, y a la luz de la doctrina de jurisdicción primaria,** *supra*, **los casos bajo esta segunda modalidad deben ser adjudicados por los tribunales de justicia, ya que en ellos la única cuestión a resolverse es estrictamente jurídica.**[50]

**El caso de autos, claramente cae bajo la segunda modalidad. Ello es así, debido a que el asunto planteado por los recurridos gira** exclusivamente **en torno a su derecho a inspeccionar información pública en manos del gobierno. Dicho de otro modo, la única controversia que engendra el presente caso es si los recurridos tienen o no derecho a inspeccionar el expediente en manos el Panel, a la luz del artículo 16 de la Ley Núm. 2,**[51] **y la jurisprudencia de este Tribunal. Por lo tanto, siendo ello una controversia estrictamente de derecho, forzoso es**

---

[50] Asimismo, hemos reiterado que el recurso procedente para inspeccionar y obtener copia de documentos públicos ante el tribunal en estos casos es el *mandamus*, como regla general. *Dávila v. Superintendente de Elecciones*, *supra*, pág. 274; *Prensa Insular de P.R. v. Cordero, Auditor*, *supra*, pág. 104; Hernández Colón, *op. cit.* § 5803, pág. 434 (1997). *Cf. Soto v. Srio. de Justicia, supra*.

Sin embargo, recientemente resolvimos el caso de *Guadalupe v. Saldaña, Pres. U.P.R.*, *supra*, en donde un estudiante, que ocupaba el puesto de representante estudiantil ante la Junta Universitaria de la Universidad de Puerto Rico (U.P.R.), presentó solicitud de *mandamus* ante el TPI con el fin de lograr acceso a ciertos documentos relativa a la situación fiscal de la U.P.R. Si bien es cierto que resolvimos desestimar la acción de *mandamus* por falta de agotamiento de remedios administrativos, se subrayó, entre otras cosas, que la documentación solicitada por el estudiante *ya era de su conocimiento*, puesto que como miembro de la Junta Universitaria, había tenido amplia oportunidad de examinarla. *Id.*, pág. 45. *Véase además* D. Fernández, *op. cit.*, § 8.7, pág. 473.

---

[51] Dicho artículo establece lo siguiente:
(1) Con anterioridad a la radicación del informe final el Fiscal Especial no podrá divulgar, excepto al Panel, cualquier información obtenida durante el curso de su investigación.
(2) A fin de preservar la confidencialidad de las investigaciones y los derechos de las personas imputadas, el Panel no podrá divulgar la información que le haya sido sometida y prohibirá el acceso del público a los procesos que ventile. Por vía de excepción, en los casos en que le sea requerido, el Panel podrá divulgar información o datos bajo su control cuando tal divulgación:
(a) No interfiere indebidamente con alguna acción judicial o investigación pendiente;
(b) no priva a la persona del derecho a un juicio justo o a una sentencia imparcial;
(c) no constituye una intromisión irrazonable en la privacidad;
(d) no revela la identidad de una fuente confidencial de información;
(e) no expone al público técnicas o procedimientos investigativos que afecten el curso de estas investigaciones, y
(f) no expone la vida o la seguridad física de funcionarios, personas o testigos. 3 L.P.R.A. sec. 99w.

**concluir que el foro con jurisdicción (primaria) en este caso es el TPI.** *Ortiz v. Cooperativa de Ahorro y Crédito, supra*, **pág. 264.**[52]

IV

**Finalmente, debemos examinar si erró el TCA cuando, a pesar que denegó la expedición del auto de revisión judicial por ser un recurso "improcedente", acto seguido, precedió a exponer unas "directrices" para la solución del caso.**[53] **El peticionario alega que el TCA incidió al exponer dichas directrices o guías en su resolución, máxime "cuando no existía una controversia real, por éste carecer de jurisdicción para** entender **en los méritos del recurso". El peticionario arguye que las directrices "constituyen una mera opinión consultiva".**

Primeramente, apuntamos que los conceptos de "opinión consultiva" y *obiter dictum* han sido utilizados para referirse a un sinnúmero de prácticas judiciales. Empero, resulta necesario diferenciarlos.

El concepto de "opinión consultiva", que es de estirpe constitucional, se define como la ponencia legal emitida por un tribunal **cuando no tiene ante sí un caso o una controversia justiciable**, y cuyo resultado, por tanto, no es obligatorio. *Black's Law Dictionary*, pág. 1119 (7ma edición 1999). La doctrina de opinión consultiva es integral al concepto constitucional de "justiciabilidad" que rige en nuestra jurisdicción, el cual establece como requisito la existencia de un caso o controversia real para el ejercicio válido del poder judicial.

La doctrina de opinión consultiva intenta evitar que se produzcan decisiones en el vacío, en el abstracto, o bajo hipótesis de índole especulativa ya que no es función de los tribunales actuar como asesores o consejeros. *Com. de la Mujer v. Srio. de Justicia*, 109 D.P.R. 715, 721 (1980);

---

(g)
[52] Debido a que el foro con jurisdicción (primaria) para resolver la controversia jurídica en el caso de autos es el TPI, no será necesario analizar si el Panel, como foro administrativo, debió celebrar vista formal administrativa y luego emitir una "orden o resolución" formal, tal como sugirió el TCA en su sentencia. Apéndice,

continúa...

---

[52] ...**continuación**
pp. 7-10. Como dijimos, el Panel sencillamente carecía —y carece— de jurisdicción. Por tanto, dejamos para otra ocasión resolver dicho asunto.

[53] Específicamente, el TCA comenzó su exposición expresando que "es prudente que expongamos el estado de las doctrinas jurídicas aplicables, de manera que sirvan de guía a dicho foro en su ulterior consideración del caso,

*E.L.A. v. Aguayo*, 80 D.P.R. 552, 558-560 (1958). En fin, a los tribunales les está vedado emitir opiniones consultivas sujetas a revisión e interpretación por las otras ramas de gobierno. R. Serrano Geyls, *Derecho Constitucional de Estados Unidos y Puerto Rico*, Vol. I, pág. 116 (1986).

En cambio, el concepto de *obiter dictum* aplica cuando un tribunal emite expresiones innecesarias **en un caso o una controversia ante sí**, y acerca de interrogantes jurídicas que, propiamente, no le han sido planteadas. *Black's Law Dictionary*, *op. cit.*, pág. 1100. Tratándose de expresiones no directamente relacionadas con la controversia planteada, éstas no sientan precedente jurídico alguno. *Martínez v. Registrador*, 54 D.P.R. 7 (1938); *Ponce & Guayama Railroad Co. v. Antonetti*, 17 D.P.R. 352 (1911).

Por sus propios términos, la doctrina constitucional de "opinión consultiva" es de aplicación sólo cuando el asunto sobre el cual un tribunal se expresó **no** cumplía con el requisito constitucional de "justiciabilidad", es decir, **no se trataba propiamente de un "caso" o una "controversia"**. Los tribunales deben estar atentos de que los asuntos ante su consideración sean justiciables. De lo contrario, procede desestimar, sin mayor explicación.[54]

Por su parte, como podrá apreciarse, el concepto de *obiter dictum* presupone, según definido, que el tribunal ponente **tiene ante sí un caso real y una controversia justiciable**; un *obiter dictum* sólo implica que, al resolver, el tribunal incurre en pronunciamientos innecesarios sobre otros asuntos que no están en controversia o que no le han sido propiamente planteados en el caso. A diferencia de una opinión consultiva, el *obiter dictum* emitido por un tribunal simplemente se debe tener por no puesto, ya que no constituye parte necesaria del fallo, sino que muchas veces son meras expresiones judiciales excesivas e innecesarias.

---

se pueda [*sic*] determinar cuáles documentos, o partes de éstos, deben mantenerse confidenciales". Apéndice, pág. 12 *et seq*.

[54] Se ha sugerido que para evitar contravenir la doctrina de opiniones consultivas, los tribunales deben asegurarse siempre de 1) que los litigantes del caso sean realmente adversos; y 2) que existe una probabilidad sustancial de que un dictamen favoreciendo a *uno* de los litigantes, tendrá un efecto sobre los intereses de *ambas* partes. E. Chemerinsky, *Federal Jurisdiction* § 1.5, pág. 51 (3a edición 1999)

Ahora bien, como parte de sus pronunciamientos el TCA reconoció que el FOIA, *supra*, no es de aplicación directa a Puerto Rico.[55] Sin embargo, dicho foro expresó que "nos es persuasivo que bajo el FOIA . . . las controversias sobre acceso a información se dilucidan mediante juicio *de novo* ante los tribunales de primera instancia y no ante las cortes apelativas".[56] Además, el TCA indicó que "dado que el derecho constitucional concernido es el mismo, hemos examinado el procedimiento provisto en dicho estatuto y visto que éste está acorde con nuestra opinión, a los efectos que se ventile el asunto ante los tribunales como un juicio *de novo*".[57] Concluyó, por lo tanto, que no era procedente el recurso de revisión judicial presentado por los recurridos, sino que **procedía remitir el caso al TPI "para que éste entienda en la controversia como un juicio *de novo* . . .".**[58] A esos fines, como ya hemos señalado previamente, el TCA procedió a exponer un extenso ensayo sobre el procedimiento establecido en el FOIA y, además, procuró iluminar al foro de instancia con un conciso resumen sobre el estado de la doctrina de acceso a información en manos del gobierno vigente en Puerto Rico en ese momento.[59] Entendemos que las expresiones del TCA fueron innecesarias y excesivas.

Asimismo, no existe duda de que el caso de autos presenta una controversia justiciable. Por tanto, rechazamos el señalamiento de los recurrentes de que la sentencia del TCA constituye una opinión consultiva. Más aún, habiendo resuelto hoy que el TPI es el foro conveniente para resolver la procedencia de la solicitud de los recurridos en sus méritos –que, como ya establecimos, es una cuestión estrictamente de derecho– entendemos que es innecesario darle mayor consideración a las "guías" o "directrices" ofrecidas por el TCA en esta etapa de los procedimientos. Basta con señalar que fueron innecesarias y, como tal, constituyen *obiter dicta*. Por tanto, simplemente se tendrán por no puestas.

VI

En conclusión, resolvemos que en casos como el de autos, en donde el asunto de acceso a información se suscita en el marco exclusivo de una controversia jurídica, **y ajena a alguna otra cuestión que específicamente requiera la pericia del foro administrativo,** según definida por ley, el TPI será el foro que tiene jurisdicción. Es decir, que un ciudadano puede acudir directamente al tribunal y entablar el recurso judicial correspondiente luego de que el gobierno le haya denegado acceso a la información solicitada,[60] y siempre que, como en el caso

---

[55] Véase *López Vives v. Policía de P.R., supra*, pág. 228, nota al calce núm. 7.
[56] Apéndice, pág. 11.
[57] *Id.*
[58] *Id.*, pp. 9-10. (Énfasis suplido.)
[59] *Id.*, pp. 12-17.
[60] "En la medida en que todo ciudadano tiene el derecho a inspeccionar cualquier documento público, el acto de denegar el acceso, por si mismo, causa al solicitante un daño claro, palpable y real". *Ortiz Rivera y otro v. Bauermeister,* res. el 29 de septiembre de 2000, 152 D.P.R. ___, 2000 T.S.P.R.

de autos, la **_única cuestión planteada_** sea estrictamente jurídica: esto es, si se justifica o no el acceso a la información solicitada.

Por lo tanto, resolvemos que, en el presente caso, el foro con jurisdicción para resolver la procedencia de la solicitud de los recurridos de inspeccionar el expediente del Panel sobre el Fiscal Especial Independiente es el Tribunal de Primera Instancia.[61] En consecuencia, fue correcta en parte la resolución del Tribunal de Circuito de Apelaciones de 15 de enero de 1998 por cuanto denegó el auto de revisión judicial de la determinación del Panel.

No corresponde devolver el caso al TPI, como lo hiciera el TCA, por no haber un caso pendiente ante instancia. Los recurridos, de así creerlo conveniente a sus intereses, podrán presentar ante el Tribunal de Primera Instancia una acción judicial en reclamo de su derecho a la información solicitada.

Se dictará sentencia de conformidad con lo aquí dispuesto.

BALTASAR CORRADA DEL RIO
JUEZ ASOCIADO

---

145, 2000 J.T.S. 157, pág. 185. Ello le daría al ciudadano, "cuando menos, legitimación activa para cuestionar la validez del obstáculo que se interpone al ejercicio de sus derechos constitucionales". _Id.,_ pág. 186.

[61] Valga reiterar que los recurridos han expresado enfáticamente que **"no pretenden en forma alguna que el Tribunal revise directamente las actuaciones del FEI, y menos que le ordene al FEI el presentar cargos criminales contra el Juez Campoamor"**. Véase nota al calce núm. 8, _supra_. Solamente desean examinar el expediente como parte de su derecho constitucional a la libre expresión.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

gia M. Ortiz Rivera,
        Héctor R. Ortiz Rivera

                Recurridos


nel sobre el Fiscal            CC-1998-249
        Especial Independiente,
c. Manuel Reyes Serrano,
c. Enrique Rivera Santana,
        Lic. José Orlando Grau

                Recurrentes



                          SENTENCIA


San Juan, Puerto Rico, a 8 de octubre de 2001.

        Por los fundamentos expuestos en la Opinión que antecede, la cual
se hace formar parte íntegra de la presente, se confirma la Resolución
del Tribunal de Circuito de Apelaciones de 15 de enero de 1998 al denegar
el auto de revisión judicial de la determinación del Panel Sobre el Fiscal
Especial Independiente y se revoca en cuanto a la devolución del caso al
Tribunal de Primera Instancia. Los recurridos, de así creerlo conveniente
a sus intereses, podrán presentar ante el Tribunal de Primera Instancia
una acción judicial en reclamo de su alegado derecho a la información
solicitada.

        Lo pronunció, manda el Tribunal y certifica la Secretaria del Tribunal
Supremo. La Juez Asociada señora Naveira de Rodón y el Juez Asociado señor
Fuster Berlingeri concurren sin opinión escrita. El Juez Presidente señor
Andréu García y el Juez Asociado señor Rivera Pérez no intervienen.


                                    Isabel Llompart Zeno
                                    Secretaria del Tribunal Supremo